## Commonwealth *vs.* Thomas J. O'Day, Third.

Plymouth. September 5, 2003. - November 7, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Infernal Machine. Constitutional Law,* Probable cause. *Search and Seizure,* Probable cause. *Probable cause. Evidence,* Exculpatory.

In a criminal action charging the defendant with possession of an infernal machine — a grenade simulator — in violation of G. L. c. 266, § 102A, a Superior Court judge correctly denied the defendant's motion to suppress evidence seized at the defendant's residence during the execution of a search warrant, where an affidavit, based on information from a confidential informant, presented facts and circumstances both demonstrating the basis of the informant's knowledge that the defendant was engaged in selling drugs and establishing the informant's reliability, and where independent police corroboration, in the form of additional information gathered during police surveillance and investigation of the defendant, provided a nexus between the defendant's drug activity and his residence. [300-305]

A Superior Court judge did not abuse his discretion in denying a criminal defendant's motion to dismiss his indictment for possession of an infernal machine on the ground that the Commonwealth's destruction before trial of a grenade simulator, which police found in the defendant's residence during the execution of a search warrant, deprived the defendant of potentially exculpatory evidence, where the judge's findings that the evidence was not destroyed in bad faith and that the defendant had not established that favorable evidence would have resulted from expert examination of the device were not clearly erroneous. [305-308]

Indictments found and returned in the Superior Court Department on January 16, 1998.

A pretrial motion to suppress evidence was heard by *Richard J. Chin,* J.; a motion to dismiss was heard by *Mitchell J. Sikora, Jr.,* J.; and the cases were tried before *John R. Tierney,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Nona E. Walker,* Committee for Public Counsel Services, for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant, Thomas J. O'Day, III, was found guilty of possession of an infernal machine in violation of G. L. c. 266, § 102A.[1] He appealed from the denial of his motion to suppress evidence seized in his residence and his motion to dismiss the indictment charging possession of a grenade simulator that was destroyed by the Commonwealth prior to trial. The Appeals Court concluded that the motion to suppress should have been allowed and therefore reversed the judgment. *Commonwealth* v. *O'Day,* 56 Mass. App. Ct. 833, 840 (2002).[2] We granted the Commonwealth's application for further appellate review and affirm the conviction.

1. *Motion to Suppress.* On November 6, 1997, the State police executed a search warrant at the defendant's residence at 10 Hunt Street in Brockton, and they seized 1.64 grams of cocaine, a revolver, and a grenade simulator. The search warrant was issued based on the affidavit of John Brooks, a State trooper experienced in controlled substance investigations. The affidavit recites information supplied by a confidential informant and by State troopers who participated in surveillance of the defendant. The defendant concedes that the affidavit contained "substantial information" concerning the presence of drugs at DJ's Pub in Brockton where the defendant worked as a doorman, but claims there was no probable cause to believe that drugs were located at his home.[3]

We note that the motion judge made findings of fact. However, our inquiry as to the sufficiency of the search warrant application always begins and ends with the "four corners of the affidavit." *Commonwealth* v. *Villella,* 39 Mass. App. Ct. 426, 428 (1995). See *Commonwealth* v. *Cefalo,* 381 Mass. 319, 328-330 (1980) ("Our reading of the affidavit . . ."); *Com-*

---

[1]The defendant was acquitted of possession of a firearm without an identification card and unlawful possession of a controlled substance.

[2]Because of its holding on the motion to suppress, the Appeals Court never reached the claim of error concerning the motion to dismiss. *Commonwealth* v. *O'Day,* 56 Mass. App. Ct. 833, 840-841 (2002).

[3]The defendant's claims are made under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.

*monwealth* v. *McRae*, 31 Mass. App. Ct. 559, 559-560 (1991) (citing G. L. c. 276, § 2B). The magistrate considers a question of law: whether the facts presented in the affidavit and the reasonable inferences therefrom constitute probable cause. That conclusion of law is neither buttressed nor diminished by other evidence. Thus, we determine whether, based on the affidavit in its entirety, the magistrate had a substantial basis to conclude that a crime had been committed, *Commonwealth* v. *Donahue*, 430 Mass. 710, 715 (2000), and that the items described in the warrant were related to the criminal activity and probably in the place to be searched. *Commonwealth* v. *Upton*, 394 Mass. 363, 370 (1985). The motion judge was correct that the affidavit established probable cause to search the defendant's residence, and we uphold on that basis. His findings of fact were superfluous. We summarize the facts recited in the affidavit.

a. *Facts.* From a confidential informant, State Trooper John Brooks learned of a cocaine-selling operation at DJ's Pub on South Main Street in Brockton. The informant had purchased powdered and "crack" cocaine from sellers at the pub during the previous year. According to the informant, the sales were made face-to-face in remote areas of the bar primarily during the evening, and the sellers kept the cocaine "on their person." The informant described one of the sellers as "Tommy," a doorman at DJ's Pub who also supplied young males with cocaine for distribution. "Tommy" was known to Trooper Brooks as the defendant, who resided at 10 Hunt Street in Brockton. Brooks also was aware that the defendant had "a lengthy record," which included thirty-two arraignments and on three occasions charges of unlawful possession of a firearm.

Based on this information, Brooks, with three other State troopers, conducted a series of surveillances. The first surveillance was of DJ's Pub on the evening of September 27, 1997. The defendant arrived in a truck registered to his girl friend and walked into the bar. Two men immediately approached him. Before the defendant's arrival, these two men had been pacing back and forth anxiously, looking out the front door, and were the only people in the bar who were not drinking. After a brief conversation, the defendant and these two men walked into the men's room together. A short time later, the defendant's

companions left the bar after emerging from the bathroom with him. Trooper Marc Lavoie, another officer who appeared to have an extensive background in narcotics, stated that this behavior was consistent with drug distribution.[4] The defendant repeated similar transactions with several other individuals in the bar that evening. The troopers also had the confidential informant make a controlled buy of cocaine from the defendant that evening at the bar.

A second surveillance took place on the evening of October 9, 1997. At approximately 7 P.M., Brooks and four other State troopers set up surveillance of the defendant's residence at 10 Hunt Street. Several vehicles were parked in front of the residence and in his driveway. Brooks observed "other" visitors arrive and depart from the defendant's residence after a "brief stay." Based on his experience, Brooks determined this behavior was consistent with narcotics distribution. The defendant was seen leaving his residence and departing in his truck at 8:13 P.M. Mobile surveillance followed the truck from the residence to DJ's Pub. At approximately 8:15 P.M., the defendant entered the bar, where interior surveillance had already been established. An anxious male immediately greeted the defendant, and the two sat at a table while exchanging something under it. At least four times on this evening, Brooks observed the defendant leave the bar and speak briefly on a cellular telephone as he looked up and down Main Street. At one time during the surveillance, the troopers observed the defendant leave the bar and enter the truck. An unknown male also left the bar and approached the truck. The man stood for two minutes at the open passenger side door of the truck, then closed the door and returned to the bar. Trooper Brooks believed that this activity was "consistent with the manner in which narcotics [sales] are transacted." The defendant then participated in a series of exchanges beneath a table in the bar with several individuals. The confidential

---

[4]The affidavit contained no information regarding the narcotics experience or training of Trooper Lavoie, nor did it even state that his "training and experience" are in narcotics. However, reading the affidavit in a commonsense manner, *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 484 U.S. 860 (1983), Brooks apparently believed that Lavoie was experienced in narcotics investigations.

informant made a controlled buy from the defendant in a similar manner, and the buy was observed by an undercover trooper.

A third surveillance of DJ's Pub and the defendant's residence occurred on November 1, 1997. State troopers observed the same pattern of visitors to the defendant's residence as on the previous occasion: "several vehicles that arrived and departed . . . after a brief stay." The defendant departed his residence at 8:04 P.M. and drove directly to DJ's Pub. Surveillance within the bar established that the defendant went into the men's room several times with a different male, each visit of short duration. The confidential informant engaged in a third controlled buy of cocaine from the defendant. Again, the defendant spoke on his cellular telephone in brief conversations outside the bar. At one point, he went to his truck, reached inside the passenger door, and immediately returned to the bar.

Brooks learned that electrical service for the defendant's residence was in his girl friend's name. Based on years of investigative experience, Brooks was aware that "individuals who are involved in illegal activity frequently deploy others to register their vehicles and establish essential utilities [in order to] conceal [their] identity, place of residence, and to frustrate the efforts by law enforcement." The trooper's description of the defendant's house stated that signs warning "Beware of Dog" and "Prohibita el Paso" were affixed to the doors of the residence.

The judge denied the motion to suppress, concluding, as do we, that based on the information in the affidavit, there was probable cause for the magistrate to believe that the defendant's residence was "connected to the ongoing drug activity," and that the confidential informant's reliability had been established.

b. *Probable cause.* "The Fourth Amendment [to the United States Constitution] and art. 14 [of the Massachusetts Declaration of Rights] do not define 'probable cause' . . . ." *Commonwealth* v. *Cefalo*, 381 Mass. 319, 328 (1980). To establish probable cause to obtain a search warrant, the affidavit must "contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they may reasonably be expected to be located in the place to be searched." *Id.* "Where

information from a confidential informant is relied on to supply probable cause to arrest and to search, art. 14 requires that the affidavit apprise the magistrate of some facts and circumstances showing both (1) the basis of the informant's knowledge, and (2) the credibility of the informant or the reliability of his information." *Commonwealth* v. *Blake*, 413 Mass. 823, 826 (1992).[5] Independent police corroboration of an informant's tip can compensate for deficiencies in either or both prongs to satisfy the probable cause requirement of art. 14. *Id.* at 826-827. "Furthermore, the affidavit should be read as a whole, not parsed, severed, and subjected to hypercritical analysis." *Id.* at 827. "In each case, the basic question for the magistrate is whether he has a substantial basis for concluding that any of the articles described in the warrant are probably in the place to be searched." *Commonwealth* v. *Upton*, 394 Mass. 363, 370 (1985).

The information in the affidavit satisfied both prongs of the *Aguilar-Spinelli* test. See *Commonwealth* v. *Upton, supra* at 374, citing *Spinelli* v. *United States*, 393 U.S. 410 (1969); *Aguilar* v. *Texas*, 378 U.S. 108 (1964). The confidential informant had a basis for knowing that the defendant sold drugs because he described in detail the individuals selling drugs in DJ's Pub, including the defendant, and the mechanics of a typical drug sale with "Tommy," the defendant. The informant had personally purchased drugs from the defendant in the past year and participated in three controlled purchases of cocaine with the defendant, whom he confirmed was "Tommy." The level of detail the informant provided, both as to the identity of the seller and the drug-selling operation in DJ's Pub, was "consistent with personal observation, not mere recitation of a casual rumor." *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 374 (2003). See *Commonwealth* v. *Parapar*, 404 Mass. 319, 322 (1989).

The affidavit also established the informant's veracity. The officers knew the identity of the informant and his "whereabouts." *Commonwealth* v. *Alfonso A., supra* at 375

---

[5] "We review the contested search in light of the more stringent standards of art. 14, with the understanding that, if these standards are met, so too are those of the Fourth Amendment." *Commonwealth* v. *Byfield*, 413 Mass. 426, 429 n.5 (1992).

(distinguishing between "untraceable, unknown" sources and confidential, yet known informants). The informant provided a detailed description of the defendant's drug business that was confirmed by the controlled buys he made. See *id.* at 376; *Commonwealth* v. *Parapar*, *supra* at 323. See also *Commonwealth* v. *Warren*, 418 Mass. 86, 89 (1994) ("A controlled purchase of narcotics, supervised by the police, provides probable cause to issue a search warrant").

We are convinced, as was the motion judge, that the independent police corroboration supplied the additional "color" to establish probable cause to search the defendant's residence. *Commonwealth* v. *Saleh*, 396 Mass. 406, 411 (1985). The defendant asserts that there was not a sufficient nexus between the activities at issue and the defendant's residence to establish that the defendant was storing or selling drugs there. Although the details provided by the confidential informant, standing alone, did not establish a nexus between the defendant's drug activity and his residence, the additional information gathered by the State troopers during their surveillances and investigation established probable cause.

"The nexus may be found in 'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide' " the drugs he sells. *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 484 U.S. 860 (1983), quoting *United States* v. *Lucarz*, 430 F.2d 1051, 1053 (9th Cir. 1970). The State troopers accumulated additional information that, based on their experience, was consistent with selling or storing drugs at the defendant's residence: brief visits by a number of people arriving in cars on two separate evenings several weeks apart[6] and the listing of his truck and electrical utilities in his girl friend's name. See *Commonwealth* v. *Para-*

---

[6]The defendant contends that there are other, innocent explanations for this pattern of visitors. The fact that there may be other explanations for the activities observed by the police does not negate the proposition that the described activity is, in the opinion of experienced drug investigators, consistent with drug selling and may be considered in the probable cause equation. See *Commonwealth* v. *Welch*, 420 Mass. 646, 653 (1995) ("The defendant's behavior took on special significance to the trained eye and could be relied on by the police in making their assessment of the existence of probable cause"); *Com-*

*par, supra* at 321 ("The troopers opined, based upon the amount of traffic at the location, that there was a large scale drug operation there"). During two surveillances, the defendant was observed departing from his residence in his truck, proceeding directly to DJ's Pub, and engaging therein in what appeared to be drug transactions. The reasonable inference was that the defendant brought a substantial quantity of drugs with him to the pub. It was unlikely that the defendant obtained the drugs from within the bar, as the defendant argues, or from any other location because he was constantly watched by the officers.[7] It appeared that the drugs were transported in the truck, to which he returned to replenish his supply. Given the value of drugs, the quantity the defendant sold each evening in the pub, and the frequency of visitors to his home, it was unlikely that the defendant would keep so large a supply of drugs in the truck while at home. Even though the defendant was not seen carrying anything from his house to the truck, cf. *Commonwealth* v. *DiStefano*, 22 Mass. App. Ct. 535, 538 (1986) (drug dealer seen reentering house carrying small package), valuable quantities of crack and powdered cocaine are transported and sold in small bags that can be concealed easily on one's person. Indeed, the confidential informant stated that the sellers at the bar kept the cocaine "on their person." Finally, the defendant's residence had signs warning unwanted visitors from entering, which sug-

---

*monwealth* v. *Cast*, 407 Mass. 891, 900 (1990), quoting *Commonwealth* v. *Myers*, 16 Mass. App. Ct. 554, 557 (1983) ("Observations taking on special significance 'to the trained eye of the officer,' may be relied upon by an officer in making his or her assessment of the existence of probable cause"). Moreover, the observation of numerous brief visits to the defendant's home on two separate occasions need not be considered in a vacuum. The affidavit contained abundant evidence of the defendant's involvement in drug dealing at the bar. Against that backdrop, evidence that there were a number of brief visitors to his home would logically suggest that drug dealing was also occurring there.

[7]The defendant argues that a man described by the confidential informant as "Poppy" lived in an apartment above the bar and, based on the defendant's frequent contact with him at the bar, followed once by Poppy's going upstairs (as described in the affidavit), may have been the defendant's drug source. Even though that may be so, the affidavit still provided probable cause for the magistrate to believe, from all the facts therein, that the defendant stored or sold drugs at home and brought them to DJ's Pub in his truck.

gested further that the residence contained valuables.[8] Based on this information, and the reasonable inferences the magistrate could draw, there was a sufficient nexus between the defendant's drug-selling activity and his residence to establish probable cause to search the residence. It was reasonable to expect the drugs to be present at that location.

The cases on which the defendant relies to argue that probable cause was deficient are not persuasive because they involve situations in which those types of inferences could not reasonably be drawn. Some, for example, lack any detail linking the defendant's residence to drug activity: *Commonwealth* v. *Gauthier*, 425 Mass. 37, 40 (1997) (only information regarding defendant's home was that known drug dealer entered and departed residence); *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, 370 (2001) (nothing to explain why drugs would be at place searched other than place was presumed to be residence of defendant, who three days before had used heroin at another location); *Commonwealth* v. *Laughlin*, 40 Mass. App. Ct. 926, 927 (1996) (no evidence in affidavit other than defendant was drug dealer who lived at residence searched). Others are deficient in the type of corroborative evidence present in the instant case: *Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907, 908 (2003) (police observations of defendant driving one day from home to drug sale and, on another occasion, to home after drug sale without more); *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596 (1991) (no specific information in affidavit tying defendant's residence to illegal drug transactions, other than that he lived at those premises). Here, the observations made on two occasions during surveillance of the defendant's home, plus surveillance tracking him proceeding directly from home to the bar where he immediately began dealing drugs,

---

[8]The defendant maintains that this was not a fact relied on by Trooper Brooks in his affidavit. However, Brooks listed the presence of the signs in the affidavit's description of the residence. Therefore, this was an additional fact on which the magistrate reasonably could rely to infer that there was something in the house or some activity in the house the defendant sought to protect from unwanted visitors. See *Commonwealth* v. *Cefalo*, 381 Mass. 319, 329-330 (1980) (warrant should not be invalidated by interpreting affidavit in "hypertechnical, rather than a commonsense, manner"); *Commonwealth* v. *Vitello*, 367 Mass. 224, 272 (1975); *Commonwealth* v. *Todisco*, 363 Mass. 445, 449 (1973).

combined with observations of the defendant's going out to the truck as part of his sales activity, provided the requisite nexus between the residence and the drug dealing.

We conclude that the motion judge properly denied the motion to suppress the evidence seized during the execution of the search warrant.

2. *Motion to dismiss.* The defendant argues that the judge erred in denying his motion to dismiss the indictment for possession of an infernal machine.[9] He claims that the destruction of the grenade simulator found in his residence during execution of the search warrant denied him potentially exculpatory evidence, because he could not have the device tested by experts to determine whether it met the statutory definition[s] of "infernal machine." Thus he contends that the destruction of the device violated his right to a fair trial guaranteed by the due process clause of the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The judge who heard this motion disagreed. We conclude that the judge did not abuse his discretion in so ruling.

"When potentially exculpatory evidence is lost or destroyed, the culpability of the government will be weighed along with the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), quoting *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986). Even though the grenade simulator was the subject matter of the indictment and obviously material,[10] the judge concluded that the defendant failed to meet his burden under the other two prongs of the balancing test. First, the judge found that there was no bad faith or culpability on the part of

[9]General Laws c. 266, § 102A, criminalizes the possession of or having "under his control" an "infernal machine or a similar instrument, contrivance or device . . . . The term 'infernal machine' . . . include[s] any device for endangering life or doing unusual damage to property, or both, by fire or, explosion, whether or not contrived to ignite or explode automatically and whether or not disguised so as to appear harmless."

[10]The motion judge found that the defendant failed to establish the materiality of the evidence. We take this to mean that the judge determined that the defendant had not shown that it would be exculpatory, and hence would not be material in that sense.

the police. Second, as to prejudice to the defendant, the judge ruled that the defendant had not established that favorable evidence would have resulted from an examination of the grenade simulator by the defense expert.

"When reviewing the denial of a motion to dismiss based on the Commonwealth's alleged [destruction] of exculpatory evidence, we accept the judge's subsidiary findings in the absence of clear error" and "will not disturb the judge's decision except for a clear abuse of discretion." *Commonwealth* v. *Cintron*, 438 Mass. 779, 784 (2003). The defendant claims that the judge's findings were clearly erroneous with respect both to culpability and prejudice. We examine each prong in turn.

In regard to the Commonwealth's culpability, the judge did not find "an unacceptable degree of culpability on the part of the police." On hearing expert testimony from both sides, the judge determined that the State police had a "rational, good faith concern" concerning the safety of the grenade simulator.

A grenade simulator is a device employed by the military to simulate the noise and effects of a real grenade. The Commonwealth's expert, Trooper William P. Qualls,[11] testified that these devices typically contain more "photo flash powder" than devices that have caused physical injuries in the past. This particular device had been modified: metal pellets or BBs had been encrusted on its exterior to serve as shrapnel when the device exploded, rendering it even more dangerous. Qualls testified, and the judge concluded, that the device could not be stored safely because heat, shock, or friction might have caused it to explode. Furthermore, testing the device would have required that it "be handled in an improper fashion . . . not taught [to the State bomb squad]" and contrary to Federal guidelines. According to Qualls, when discovering an item that could potentially be a bomb, such as the device in this case, the

---

[11]At the time of the hearing, Qualls had been a State trooper for six years, a member of the State police bomb squad for two years, and was certified by the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearms, and the Drug Enforcement Administration. Qualls served in the army for eleven years, two active and nine in the reserves, and has dealt with explosives as a drill sergeant. Qualls graduated from a five-week intensive program from the "one school in the country that teaches bomb technicians for law enforcement."

police bomb squad employs a "render safe procedure:" they countercharge the device with an explosive material. That is what was done here. The police removed the device, and it was detonated four days later[12] by members of the State police bomb squad who attached a blasting cap, placed it in a shallow hole and remotely triggered the explosion in a wooded area behind the State police barracks. An analysis of the dirt where the grenade simulator was detonated revealed that there was some flash powder inside the device.

Although the Commonwealth's destruction was intentional, the judge found that it was not done in bad faith. The police were confronted with the need to balance protection of the public and of themselves from injury against the preservation of evidence for use at trial.[13] The judge credited the testimony of the Commonwealth's expert as opposed to that of the expert called by the defendant and could permissibly find that the Commonwealth was not culpable for detonating the device. *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986) (extraordinary circumstances mitigate culpability for lost evidence).

It was not error for the judge to conclude that the defendant had failed to satisfy his burden to demonstrate prejudice to him by the destruction of the device. The defendant has not shown a " 'reasonable possibility, based on concrete evidence rather than fertile imagination,' that access to the [material] would have produced evidence favorable to his cause." *Commonwealth* v. *Willie*, 400 Mass. 427, 433 (1987), quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). The judge did "not find from the

---

[12]The defendant argues that the State police's concern for safety is diminished by the fact that the grenade simulator was stored for four days after its seizure before it was finally destroyed. Trooper Qualls testified at the motion hearing that the fact that the grenade simulator was stored for four days before it was destroyed was "actually a mistake . . . due to ignorance on some law enforcement parts in dealing with a device such as this." The importance of public safety is too great to blame the Commonwealth solely because the proper procedures were taken far later than they should have been.

[13]As the judge noted, the substantive criminal statute grants the Commissioner of Public Safety broad authority over the seized infernal machine. G. L. c. 266, § 102A ("Notice of the seizure of any such machine, instrument, contrivance or device shall be sent forthwith to the commissioner of public safety and the article seized shall be subject to his order").

evidence and argument of the defendant's expert and counsel a specific explanation of exculpatory information, tests, or processes available from a preserved device of this kind . . . whether a feasible test could measure the rate of powder burn; or whether a slow-motion video record of an alternate form of detonation would enable measurement of the force of the dispersing pellets or other components of the device." The only evidence offered by the defense to demonstrate prejudice was the testimony of its expert that if there were suspicion that the device had been altered internally, he would have recommended an X-ray or CAT scan to determine whether it was actually modified. This does not constitute a "reasonable possibility" of producing evidence favorable to the defense. "Where as here, the defendant relies on mere conjecture and surmise, contradicted by evidence in the record, that [the destroyed] evidence would have been exculpatory and where the evidence was [destroyed] not because of bad faith but under extraordinary circumstances which mitigate the culpability for the [destruction], there is no ground for reversal." *Commonwealth* v. *Charles, supra* at 14.

Finally, the defendant argues that the "judge did not apply the proper test" for determining whether the destroyed evidence was exculpatory. The Appeals Court decision the defendant cites uses the same standard we recited above: "When the evidence no longer exists and the defendant has made a specific request for it, the defendant need only show a *reasonable possibility* that the evidence was exculpatory. Put another way, the defendant is entitled to relief pursuant to the more favorable standard; whether access to the destroyed or lost evidence 'might have' affected the verdict" (emphasis added). *Commonwealth* v. *White*, 47 Mass. App. Ct. 430, 433 (1999). As the judge correctly found, the defendant has failed to show such a reasonable possibility.

3. *Conclusion.* Both the motion to suppress and the motion to dismiss were properly denied.

*So ordered.*