COMMONWEALTH *vs.* PATRICIO SANTIAGO, JR.

No. 05-P-698.

Bristol. March 21, 2006. - June 13, 2006.

Present: RAPOZA, KANTROWITZ, & GREEN, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Affidavit, Warrant, Probable cause, Forcible entry by police, Automobile. *Controlled Substances. Probable Cause.*

A search warrant application established the requisite nexus between the objects sought (proceeds and records of the defendant's alleged drug business) and the location to be searched. [521-522]

A motion judge did not err in denying a criminal defendant's motion to suppress evidence seized by police during a search of an apartment and a motor vehicle, where the defendant failed to demonstrate that the police violated the "knock and announce" rule in their execution of the warrant at the apartment [523], and where the warrant provided sufficient evidence to link the motor vehicle to the defendant's alleged criminal activity [523-524].

INDICTMENTS found and returned in the Superior Court Department on December 11, 2003.

A pretrial motion to suppress evidence was heard by *Robert J. Kane,* J.

Applications for leave to prosecute interlocutory appeals, filed on March 4, 2005, and April 21, 2005, were allowed by *John M. Greaney,* J., and *Roderick L. Ireland,* J., respectively, in the Supreme Judicial Court for the county of Suffolk, and the appeals were reported by them to the Appeals Court.

*David B. Mark,* Assistant District Attorney, for the Commonwealth.

*David A. Jorge* for the defendant.

KANTROWITZ, J. The motion judge ruled that a search warrant application failed to establish the requisite nexus between the objects sought and the location to be searched in that neither the

confidential informant nor the police had actually seen any "proceeds, ledgers, and records." The Commonwealth appeals. We reverse.[1]

*Background.* On October 2, 2003, the New Bedford police simultaneously executed three search warrants[2] as part of an investigation into the defendant's large-scale drug operation.[3] The search warrants were issued based upon the affidavits of Detective Michael Carrier, a member of the organized crime intelligence unit specializing in narcotics investigations, and a ten year veteran of the police force. The affidavits recite information supplied by a confidential informant and by other members of the New Bedford police who conducted a surveillance of the defendant.

The motion judge ruled that the search warrant application for 63 Monroe Drive failed to establish the requisite nexus between the objects sought and the location to be searched in that neither the confidential informant nor the police had actually seen any "records, ledgers, or proceeds inside 63 Monroe Drive and police surveillance never discovered Santiago or his accomplice bringing such proceeds, records, or ledgers into 63 Monroe Drive."[4]

*Facts.* "[O]ur inquiry as to the sufficiency of the search war-

---

[1]The defendant cross-appeals alleging that the judge should have suppressed both evidence found in a blue Nissan Maxima, as well as in a second apartment. With regard to the apartment, the defendant challenges the judge's denial of his motion to suppress, claiming that the police did not comply with the "knock and announce" rule. With regard to the blue Nissan Maxima, the defendant claims that the warrant failed to establish a sufficient Nexus between the vehicle and items sought; thus, the judge should have allowed his motion to suppress. We affirm these portions of the judge's decision for reasons that will be discussed below.

[2]The search warrants for (1) 63 Monroe Drive, New Bedford (resulting in seizure of $2,796, one Nextel phone, assorted paperwork, assorted keys, and one police frequency scanner); (2) 152 Van Buren Street (resulting in seizure of $3,907, five pills, three plastic bags of marijuana, assorted paperwork, one key to that dwelling, vehicle titles to the 1995 Nissan Maxima and a 1988 Chevrolet Nova, and one bottle of inositol powder); and (3) the blue Nissan Maxima (resulting in seizure of approximately 370 grams of cocaine, one Ruger revolver, one Smith & Wesson revolver, and a spent bullet).

[3]The defendant was charged with trafficking in cocaine (over 200 grams); trafficking in cocaine in a school zone; two counts of unlawful possession of a firearm, as well as being a repeat firearm offender.

[4]The Commonwealth's application for leave to file an interlocutory appeal

rant application always begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). We summarize the facts recited in the affidavits.[5] During the week of August 10, 2003, Sergeant Victor Mendes of the New Bedford police learned from a confidential informant[6] of a "lucrative cocaine distribution enterprise" in the Presidential Heights housing project in New Bedford. According to the informant, an individual known to "it"[7] as "Oscar"[8] (the defendant) was running a drug operation involving several residences, cars,[9] and subordinates.

The informant had purchased cocaine from Oscar over the past several months. To initiate a purchase, the informant would call the defendant at a phone number it had been given and would state the desired amount of cocaine. The defendant or one of his subordinates would then meet the informant in the area of Monroe Drive and Van Buren Street, where the drug sale would occur. The informant also described a number of cars the defendant occupied, including a blue Nissan Maxima. The affiant further learned from the informant and other detectives that the defendant lived in the Presidential Heights housing project in New Bedford,

was granted by the Supreme Judicial Court on March 16, 2005; the defendant's application for leave to file an interlocutory cross-appeal was granted on May 6, 2005. The matter was ultimately referred to this Court.

[5]The three affidavits are for the most part identical, except that the one for 63 Monroe Drive adds several paragraphs specific to that location.

[6]The affidavits established a basis of knowledge and veracity through, among other things, four controlled buys. Reliability was shown, further, through the informant's past information resulting in police seizure of significant amounts of drugs and cash, and in several arrests, with at least one conviction and one pending matter. See *Commonwealth* v. *Blake*, 413 Mass. 823, 826 (1992); *O'Day*, 440 Mass. at 301.

[7]In the affidavits, in order to protect the identity of the confidential informant, the informant is referred to as "it." We do likewise.

[8]The informant identified "Oscar" as the defendant Patricio Oscar Santiago. Detective Carrier also learned from several other detectives that they were familiar with Santiago and that he was a member of the "Latin Kings" street gang.

[9]The vehicles included a blue Crown Victoria, a white Honda Prelude, a white Honda Accord, a Gold Chevy Malibu, a gray Nissan Maxima, and a blue Nissan Maxima.

and appeared to be staying at his mother's residence at 63 Monroe Drive.[10]

Based on this information, Carrier, with the assistance of other members of the New Bedford police, assembled a surveillance team for 63 Monroe Drive and arranged for several controlled buys from the defendant involving the informant.

During the week of August 10, 2003, the surveillance team observed the defendant standing on Van Buren Street in the area of Monroe Drive. Sergeant Mendes then initiated a first controlled buy involving the informant. The informant, upon leaving Mendes's custody, went directly to the defendant, exchanged money for cocaine, and returned to Mendes to whom it handed the drugs.

During the week of August 31, surveillance was again set up in the area of 63 Monroe Drive. The surveillance team observed a group of three males in the area of Monroe Drive and Van Buren Street. For the second controlled buy, the informant again made phone contact with the defendant and was instructed to proceed to the area of Monroe Drive for the exchange. As the informant approached the area, "Coco," subsequently identified as Orlando Martinez-Cirino, left the group of males and entered one of the apartments at 63-65 Monroe Drive, emerging again shortly thereafter.[11] When Coco returned to the group, he exchanged drugs for money with the informant.

In preparation for the third controlled buy during the week of September 21, the informant again called the defendant. This time it was instructed to come to a different location. As the surveillance team was transitioning to the new location, Coco was observed operating a blue Nissan Maxima. As the vehicle approached the designated location, the defendant also arrived in a different car. The informant met with Santiago and after a short conversation, Santiago went over to the blue Nissan

[10]The confidential informant was often directed to meet the defendant in that general area to consummate the drug deal. At the suppression hearing the defendant testified that his address is 239 Myrtle Street, New Bedford, located in close proximity to Van Buren Street and Monroe Drive.

[11]The apartments at Monroe Drive and Van Buren Street are all in the same public housing development owned by the New Bedford Housing Authority. The testimony revealed that for Van Buren Street, at least, there are four apartments in a row in one long building, each with its own door.

Maxima. He entered the vehicle for about ten seconds, walked back to the informant, and exchanged drugs for money.

Within seventy-two hours before obtaining the first search warrants,[12] the surveillance team again observed Coco and Santiago entering and exiting the parked blue Nissan Maxima. In preparation for a fourth controlled buy, the informant again made phone contact with the defendant. It was told to come to the area of Monroe Drive. The surveillance team observed as the informant, Santiago, and Coco approached that location. Santiago walked directly to the informant, who handed him the buy money. Santiago then signaled Coco, who was observing from a distance. The officers then saw Coco enter an apartment on Van Buren Street. He emerged again after approximately one minute and walked directly to the informant, to whom he handed the cocaine. The informant then returned to Detective Carrier and handed him the cocaine.

In addition, Carrier stated that he and other members of his unit on numerous occasions observed Santiago going in and out of the apartment at 63 Monroe Drive, leading them to believe that he resided there. The defendant appeared to be entering the apartment without knocking and, at times, using a key. He also would remain inside the apartment for extended periods of time. The informant further stated that on at least one occasion the defendant exited the front door at 63 Monroe Drive and directly went to the informant to sell drugs. Based on police surveillance and information obtained from the confidential informant, Carrier determined that 63 Monroe Drive constituted the base of the defendant's operations.

Surveillance revealed that the defendant and his associates used Nextel cellular phones and, on a number of occasions, were also using the two-way communication feature of these phones. Additionally, the confidential informant would call the defendant's cell phone number to arrange for drug deals.

Detective Carrier further stated that he observed how the defendant, Coco, and other associates were approached by a number of people in motor vehicles or on foot. After brief

---

[12]The search warrants for 152 Van Buren Street and the blue Maxima were obtained on September 28, 2003; the warrant for 63 Monroe Drive was obtained on October 2, 2003.

conversations, the defendant or Coco would go to 152 Van Buren Street, return shortly thereafter, and engage in an exchange with the waiting party. Carrier stated that based on his experience and training, this was consistent with illicit drug activity.

Detective Carrier's specialized training and experience indicated that it is common practice for upper level drug dealers such as the defendant to store the narcotics and their proceeds in separate locations. Carrier concluded, therefore, based on information provided by the confidential informant and police surveillance, that the bulk of the narcotics were under the immediate control of Coco at 152 Van Buren Street, while the proceeds, records, or ledgers, including his cellular phone and any records it generated, were located at 63 Monroe Drive, which appeared to be the defendant's residence.

The motion judge denied the defendant's motion to suppress the evidence found in the blue Nissan Maxima and at 152 Van Buren Street. He also ruled against the defendant on his claim that the police had violated the "knock and announce rule" when they entered the apartments at 152 Van Buren Street and 63 Monroe Drive.

Conversely, with regard to the affidavit in support of the search warrant for 63 Monroe Drive, the motion judge determined that "the affidavit failed to establish a sufficient nexus between drug records, ledgers, and proceeds and 63 Monroe Drive."[13] He therefore suppressed all the evidence derived from the execution of the search warrant at that location, including the statements taken from the defendant during the execution of the warrant.[14]

On appeal, the Commonwealth challenges the motion judge's

---

[13]In addition, the judge determined that the affidavit for 63 Monroe Drive failed to establish a sufficient nexus "demonstrating that cocaine would be found at 63 Monroe Drive." Given that no cocaine was found there, we need comment no further other than to say that it appears that the second controlled buy involved that site.

[14]The police questioned the defendant during their search of 63 Monroe Street. The judge found that the defendant was properly given his Miranda rights. Nonetheless, those statements were also suppressed, the judge ruling that "[i]n the course of the search of 63 Monroe Drive, the police discovered keys, and the police questioned Santiago about the keys. This interrogation, occurring amid the execution of the warrant, derived from the illegal search and requires suppression. The administration of Miranda warnings and Santiago's waiver of

determination that the information in support of the warrant application for 63 Monroe Drive failed to establish the necessary nexus between proceeds and records of the defendant's drug business and the apartment. The defendant, in his cross-appeal, claims that the judge improperly denied his motion to suppress with regard to the blue Nissan Maxima and the apartment at 152 Van Buren Street.

*Nexus.* "The information in the affidavit must be adequate to establish a timely nexus between the defendant and the location to be searched and to permit the determination that the particular items of criminal activity sought reasonably could be expected to be found there." *Commonwealth* v. *Wade*, 64 Mass. App. Ct. 648, 651 (2005). "Furthermore, the affidavit should be read as a whole, not parsed, severed, and subjected to hypercritical analysis." *Commonwealth* v. *O'Day*, 440 Mass. at 301, quoting from *Commonwealth* v. *Blake*, 413 Mass. 823, 827 (1992).

"In each case, the basic question for the magistrate is whether he has a substantial basis for concluding that any of the articles described in the warrant are probably in the place to be searched." *Commonwealth* v. *Upton*, 394 Mass. 363, 370 (1985). To arrive at that conclusion, the magistrate "may apply common knowledge and may draw reasonable inferences from the facts before him." *Commonwealth* v. *Taglieri*, 378 Mass. 196, 198 (1979). "This is consistent with the view that 'affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion.' " *Ibid.*, quoting from *United States* v. *Ventresca*, 380 U.S. 102, 108 (1965).

Further, "weight must be given to the special experience of a law enforcement officer who has executed an affidavit. For example, where such an officer states that he has drawn inferences from facts which an inexperienced person might not draw from those facts, the magistrate may rely on those inferences." *Taglieri*, *supra* at 199. See Grasso & McEvoy, Suppression Matters under Massachusetts Law § 10-5(b)(1) (2004-2005).

In the present case, Detective Carrier was a longstanding member of the New Bedford police force with significant

those rights failed to insulate the statements from the illegal search."

experience and training in narcotics investigations. Based on this experience, he concluded that in a drug operation of the size carried out by the defendant, the bulk of the drugs would usually be kept separate from any records or proceeds affiliated with the operation.

On the basis of the affidavit, it was reasonable, if not compelling, to conclude that the defendant was a drug dealer responsible for a large-scale operation; that he resided at, or at least had unlimited access to, 63 Monroe Drive; that he and his subordinates used record-generating cellular telephones; that the bulk of the narcotics were not kept at 63 Monroe Drive; and that the defendant had access to a blue Nissan Maxima, from which drugs were delivered and in which he met with his compatriot to transact "business." See *Commonwealth* v. *Taglieri*, 378 Mass. at 199; *Commonwealth* v. *Cruz*, 430 Mass. 838, 842-843 (2000).

Thus, taking the affidavit as a whole, interpreting it in a commonsense fashion, and relying on Carrier's experience, the clerk-magistrate properly concluded that the affidavit established probable cause that records of the defendant's narcotics operation could be found at 63 Monroe Drive. See *ibid*.

Drug dealers do not provide receipts for product purchases; nor are informants privy to the private business records of any money generating drug enterprise. What records are kept, and surely they are, given the nature of the business, are typically beyond the reach of police surveillance. Once it was established that the defendant was operating a drug business that included 63 Monroe Drive,[15] little, if anything more, needed to be added in the affidavit to justify searching for "records, ledgers, or proceeds."[16]

---

[15]Recapping, the second controlled buy involved the informant contacting the defendant, whose cohort went into 63-65 Monroe Drive, came out shortly thereafter and consummated the drug deal; police observations of the defendant going in and out of the apartment on numerous occasions, entering without knocking, using a key to enter, and staying there for extended times, led them to believe that he resided there; the defendant leaving the apartment and going directly over to the informant to sell it drugs; were all factors leading the police reasonably to conclude that 63 Monroe Drive was involved in the drug operation.

[16]As phones were used to consummate the drug deals, the bills generated by their use would be of significant evidentiary value.

*Cross-appeal.* The defendant argues the invalidity of the search at 152 Van Buren Street in that the police did not "knock and announce."

"The requirement that police 'knock and announce' their presence and purpose prior to the execution of a search warrant" is a principle of the Massachusetts common law. *Commonwealth* v. *Jimenez,* 438 Mass. 213, 215 (2002). "Among the purposes of this rule are the protection of individual privacy interests and the desire to minimize the potential for violence or property damage." *Commonwealth* v. *Macias,* 429 Mass. 698, 701 (1999).

At a suppression hearing, the motion judge heard testimony from police officers, the defendant, and Sindia Ramos, a resident at 152 Van Buren Street, with regard to whether the police properly knocked and announced their imminent entries into the apartments at 63 Monroe Drive and 152 Van Buren Street. In assessing credibility, the judge accepted the testimony of the police. There is no justification to upset that valid determination. See *Commonwealth* v. *Mims,* 12 Mass. App. Ct. 962, 963 (1981).

A closer case concerns the 370 grams of cocaine, two guns and one spent bullet, discovered in the blue Maxima, the sole vehicle, of the many the defendant used, for which the police sought a warrant. The defendant was observed as the driver and passenger of the blue Nissan Maxima to which, in the third controlled buy, the defendant returned to apparently secure the drugs from Coco, the driver.[17] Within seventy-two hours prior to applying for the warrant to search the blue Nissan Maxima, (1) the police observed Coco and the defendant entering and exiting the car in a parked position in the area of Monroe Drive and Van Buren Street; and (2) the confidential informant notified Detective Carrier that it had again purchased cocaine from Santiago who was operating the blue Nissan Maxima at the time.

It is reasonable to infer that drugs were kept inside the motor vehicle and produced from there to conduct drug transactions, most notably during the third controlled buy. The car also served as a meeting place, in that the defendant and Coco met and

---

[17]He entered the vehicle for about ten seconds and then returned to the informant with whom he exchanged money for cocaine.

talked in the parked vehicle. It is not a leap of conjecture that discussions about illicit drug activity were conducted within the secreted, stationary area. Every time a request for drugs was made, they were nearly instantaneously available, evidence of the large-scale nature of the operation, and the ability of the dealers to supply their product.

The defendant cites *Commonwealth* v. *Wade*, 64 Mass. App. Ct. 648 (2005), in support of his argument. In *Wade*, this court found the search warrant insufficient as "the only evidence linking the vehicle to criminal activity being the two staged purchases where the defendant arrived in the Explorer." *Id.* at 653. Cf. *Commonwealth* v. *Staines*, 441 Mass. 521, 528-529 (2004). Here, as has been noted, there is more. First, there is the extensive drug operation itself, involving different apartments and vehicles. Second, the defendant and his cohort were observed by police meeting in the parked car, ostensibly discussing their business, most recently three days prior to the warrant application. Third, there was a controlled buy in which the defendant returned to the car, driven by Coco, to retrieve the drugs that were sold to the informant. This suggests that drugs were kept and ready in the car. Fourth, there is the report of a noncontrolled drug purchase by the informant within seventy-two hours before the search warrant was issued, in which the defendant used the car to deliver the drugs. As the motion judge concluded, "the proximate uses of the [vehicle] to facilitate drug sales" supported a reasonable inference "that the blue Nissan Maxima contained contraband, evidence of drug sales, or proceeds from drug transactions." "The fact that there may be other explanations for the activities observed by the police does not negate the proposition that the described activity is, in the opinion of experienced drug investigators, consistent with drug selling and may be considered in the probable cause equation." *Commonwealth* v. *O'Day*, 440 Mass. at 302 n.6.

Reading the affidavit in a commonsense, nonhypertechnical, manner, *id.* at 304 n.8, supports the conclusion of the motion judge denying the defendant's motion to suppress this evidence.

*Conclusion.* The order suppressing evidence derived from

execution of the search warrant at 63 Monroe Drive is reversed.[18] With regard to 152 Van Buren Street and the blue Nissan Maxima, the motion judge's ruling is affirmed.

*So ordered.*

---

[18]So, too, the defendant's statements to the police during the search of 63 Monroe Drive that were suppressed because they derived from an illegal search.