Billings, Thomas R, J.
The defendant is charged with trafficking in cocaine, possession of heroin with intent (subsequent offense), possession of cocaine with intent (subsequent offense), and three school zone violations. His troubles are the result of a warrantless search on April 3, 2011 of a Honda Civic in which the defendant was a passenger, followed by a warranted search on May 11, 2011 of the defendant’s person and a Toyota Camiy he was driving.
The defendant moved to suppress the fruits of both searches.[1] On March 5, 2012 the Court (Inge, J.) allowed the motion to suppress as to the Honda. On June 18, 2012 I heard argument on the second motion, that pertaining to the warrants to search the Toyota and the defendant’s person. For the reasons that follow, the motion is ALLOWED.
FACTS
On May 11, 2011 Detective Janie Munro of the Cambridge Police applied for and was granted warrants to search a certain 1995 Toyota Camiy sedan, whose plate number was specified, and the person of the defendant himself. Following the customaiy recitation of the affiant’s training and experience, she recited the following facts. A colleague reported to her during April 2011 that two anonymous calls to the department’s Drug Tip Hotline reported that a male named Karl Maurice “is selling drugs in Cambridge and utilizes a green Toyota Camiy, MA Registration 526HH0, as his mode of transportation.” Maurice was known to the Cambridge police from past drug investigations, arrests and convictions.
Also in April, the police received information from a confidential informant (“CI#1”), knowledgeable in the trade, that a man named “Moe” was selling cocaine in Cambridge; the informant had made numerous purchases from him in the preceding two months. The informant had not provided information in the past, but gave a description of “Moe” (black male, 5’7" to 5’8," in his thirties with facial hair and short hair) and his cell phone number. The informant arranged purchases by calling Moe’s cell, telling him how much money he[2] had. Moe then specified the location where they would meet and do the deal. The informant said he would be willing to make a controlled purchase from Moe.
The same month, the police heard from a second informant (“CI#2”), who said that he (see fh. 2) had purchased cocaine from “Moe” (black male, medium build, in his thirties with facial hair) on numerous occasions in the past year. Like CI#1, CI#2 was a first-time informant, but evidently appreciated the potential benefits of assisting law enforcement in its investigations by conducting a controlled purchase.
Still in April, the police heard from a third informant (“CI#3”) who, unlike the others, had provided information in the past that led to seizures of narcotics, arrests, convictions, all described with particulars as to court and type of drug; CI#3 had also provided information enabling law enforcement, on two separate occasions, to locate and arrest individuals with outstanding warrants. CI#3, too, knew Moe, whom he described as a black male, age about 35, stocky build, 180 to 200 pounds, and said he was actively selling cocaine in the Cambridge area. Moe, he reported, drove a dark-colored Toyota whose plate ended in HHO. He gave the same cell number as had CI#1, and described the same business model: buyer calls cell phone; Moe specifies meeting place. CI#1, CI#2 and CI#3, the affiant added, were not the same person, and each was ignorant of the others’ cooperation in the investigation.
The affidavit next recited the procedure for conducting a properly controlled buy: informant searched for money and drugs, then given the correct amount of currency; informant under continuous surveillance going to and coming from the purchase; informant turns drugs over to police and is searched again for other drugs and money; informant debriefed on the particulars of the sale.
On April 22, 2011 Munro and a colleague, Detective Collaza, met with CI#1, then with CI#2. Each was shown a photograph of the defendant, and each said the person depicted was the man he knew as Moe. The same day, the detectives ran a Board of Probation report on the defendant. This showed 55 criminal arraignments with considerable diversity but a nonetheless discernible focus on narcotics offenses, for which the defendant had four open charges in the Roxbuiy District Court and eleven district and superior court convictions in nine cases as old as 1992 and as recent as 2006.
In the first week of May, CI#2 reported that he had obtained Moe’s cell number (the same number as the other two had given), and agreed to make a controlled purchase. The procedure was as described above, and included police surveillance of the meet location. A green motor vehicle, plate number 526HH0, arrived, driven by a man the police were able to identify as the defendant. He and CI#2 met briefly, then separated; CI#2 then went, under surveillance, to a prearranged location where he met with the police. He produced a quantity of cocaine which field-tested positive and was consistent with the amount of the buy money and said he had obtained it from Moe in exchange for the buy money. It does not appear that the defendant was surveilled either coming to or leaving from the meeting.
The same week, CI#1 conducted a controlled buy in a procedure that was identical in all material respects to the one using CI#2, including the lack of *644 surveillance on the defendant as he came to and left the meeting.
On May 5, 2011 Det. Munro ran plate no. 552HH0 through the RMV database. It came back to a green Toyota Camiy registered to a Gregory Gerald of Arlington, Massachusetts. The affiant noted that it is common for drug dealers to use vehicles registered to others in hope of avoiding police detection.
On May 9, 2011 CI#3 was shown a photo of the defendant and identified the subject as the man he knew as Moe.
Finally, during the week of May 8, 2011 CI#1 did another controlled buy using the same procedure as before, including the lack of surveillance on the defendant coming and going.
The affidavit then included two and one-half pages of boilerplate concerning the business habits of drug dealers (cash business, record-keeping, hiding and laundering money, paraphernalia, concealment of identity and residential address, use of cell phones). The only mentions of vehicles are in the final subparagraph:
Persons involved in the distribution of drugs often conceal their distribution records, controlled substances and money either on their person, in their residence, in their cars or in their cell phones. Reference to certain information contained within some of the more fundamental and prosaic records may be needed outside of normal business hours and thus may be kept at the ready on one’s person, in a briefcase, in one’s vehicle, in rough notes or in data storage devices such as a cellular telephone. Drug dealers typically keep their cellular phones on their person or in their vehicle.
Based on all of this, the application sought permission to search the defendant’s person and the Camiy, for cocaine, books and records, currency, paraphernalia, cell phones, cell phone records, pagers, documents evidencing control of the Camiy, and its keys.
DISCUSSION
Before addressing the merits of the defendant’s argument that the search warrant application materials did not provide probable cause for the search, I pause to address briefly two arguments raised by the Commonwealth.
1. It is true that Mass.R.Crim.P. 13(a)(2) requires that motions be accompanied by an affidavit. It does not, however, require that the defendant be the affiant. Here, the defendant accompanied his motion with the two warrant applications, the supporting affidavit, and the officer’s returns, each of which was signed by the pains and penalties of peijuiy, in addition to the warrant itself. The twin purposes of the affidavit requirement — ”to enable a judge to determine whether to conduct an evidentiary hearing [and] to give fair notice to the prosecution of the particular search or seizure that the defendant is challenging," Commonwealth v. Mubdi, 456 Mass. 385, 389 (2010) — were fully satisfied. The same materials also established the defendant’s entitlement to automatic standing to contest the search of the vehicle, notwithstanding its registration in another name. Id. at 394-95.
2. The supposed application of the inevitable discoveiy rule (because the defendant, after being stopped and removed from the vehicle, threw the drugs on the ground) presupposes that the police were justified in stopping the car and removing the defendant from it in the first place. The Commonwealth argued that it should be allowed to present evidence on this point but did not, to the best of my imperfect recollection, come to the hearing prepared with a witness. The argument may not be entirely circular — it is always possible that the police executing the warrant observed a traffic infraction before initiating the stop, followed by the oft-reported furtive reaching under the front seat, as if for a weapon — but I have no indication of such; nor am I prepared to hold that a warrant that is not quite supported by probable cause maybe deemed superfluous, and its execution, a Terry stop. Such a ruling would turn “the preference to be accorded to warrants” [Commonwealth v. Germain, 396 Mass. 413, 418 (1985)) on its head, and would open the door to warrantless stops and searches based on reputation evidence alone.
Turning, then, to the merits of the warrant application: there was ample probable cause to believe that the defendant was engaged in drug dealing, and that he used the Toyota Camiy that the police proposed to search as his transportation to meetings he arranged with buyers. The veracity and basis-of-knowledge tests of Commonwealth v. Upton, 394 Mass. 363, 369-77 (1985), were satisfied, especially once the informants’ information was corroborated by three controlled buys. See Commonwealth v. Desper, 419 Mass. 163, 168 (1994); Commonwealth v. Hill 51 Mass.App.Ct. 598, 609 n.9 (2001).
The information was also sufficiently fresh, by virtue of the third controlled buy, three days before the application. See Commonwealth v. Connolly, 454 Mass. 808, 817 (2009); Commonwealth v. Turner, 71 Mass.App.Ct. 665, 669 (2008); Commonwealth v. Russell 46 Mass.App.Ct. 513, 520 (1999).
Where the application fell short was on the “nexus” requirement. “An affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.” Commonwealth v. Cinelll 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). The handful of Massachusetts cases that address probable cause to search a drug dealer’s vehicle require more than this application supplied.
In Commonwealth v. Wade, 64 Mass.App.Ct. 648, F.A.R. denied, 445 Mass. 1107 (2005), the Appeals *645 Court held that information (including controlled buys) that the target had been consummating street-level drug transactions from his car did not, by itself, establish probable cause to believe that drugs or other evidence of drug dealing would be found in the car at a date and time in the near future.
Here, the affidavit in support of the search warrant did not establish the requisite timely nexus, as it contained no basis to infer that drugs would be present in the vehicle at the time of the issuance of the warrant or, for that matter, at the time of its execution, five days after the last observation of the defendant with the informant. Nothing in the affidavit suggested that the defendant used the vehicle to store drugs . . . Nor did the affidavit establish that the defendant routinely carried an inventory of drugs ready for deliveiy. If anything, the events described implied that the defendant’s practice was to complete only one transaction at a time, leaving to meet his buyer from 15 Liberty Street (as opposed to his residence at 85 Prospect Street), and returning to 15 Liberty Street immediately thereafter.
Id. at 651-52.
The Appeals Court in Wade contrasted the warrant before it with those upheld in three other cases.
In Commonwealth v. Dion, 31 Mass.App.Ct. 168, 174 (1991), the “defendant’s attempt to secret [his] automobile key, coupled with [a] history of break-ins at [the] defendant’s apartment, permitted [the] inference that drugs were stored in his vehicle as a ‘safer depository.’ ” Wade, 64 Mass.App.Ct. at 652.
In Commonwealth v. Burt, 393 Mass. 703 (1985), the police were “investigating a continuing scheme of larceny of coins from parking meters by a group of parking meter collectors,” who had been seen transferring “heavy packages” from their traffic department vehicles into their personal vehicles. Circumstantial evidence suggested that some of the collectors, at least, were using their own cars for storage of the stolen coins which, “[u]nlike drugs, . . . were not likely to be consumed or destroyed.” Wade, 64 Mass.App.Ct. at 652, quoting Burt, 393 Mass. at 716.
In Commonwealth v. Staines, 441 Mass. 521, 525-27 (2004), the Commonwealth obtained an anticipatory warrant “to search the car for additional concealed cocaine at the time of another controlled buy.” Had this course been pursued in the case before it, the Wade court suggested, “there could well have been a different outcome” on the motion to suppress. 64 Mass.App.Ct. at 653.
One member of the panel in Wade (Katzmann, J.) dissented, arguing that there was probable cause to search the vehicle at least for evidence other than drugs, such as cash, ledgers, paraphernalia, or residue. Drugs, he felt, presented “a close question . . . Nevertheless, where in a pattern of drug dealing, a place to be searched — such as a vehicle — has itself twice been an instrumentality of a crime, reasonable inference supports a probable cause determination that drugs would be found in the vehicle.” 64 Mass.App.Ct. at 655.
The facts and the outcome were different in Commonwealth v. Santiago, 66 Mass.App.Ct. 515 (2006). There, the court affirmed the denial of a motion to suppress the fruits of a warranted search of the defendant’s vehicle, a blue Nissan Maxima, where the affidavit gave evidence of an “extensive drug operation . . . involving several apartments and vehicles”; two members of the enterprise had been seen apparently holding business meetings in the privacy of the parked Maxima; in one controlled buy, the defendant arrived in a different vehicle, but went over to the Maxima to fetch the drugs; and in another, noncontrolled purchase the defendant used the Maxima to deliver the drugs. Taken together, the court held, these facts were enough to distinguish the case from Wade. 66 Mass.App.Ct. at 524.
In Commonwealth v. Connolly, 454 Mass. 808 (2009), the SJC provided another example of information deemed sufficient to warrant a search of a drug-dealer’s vehicle. There, “[i]nformants stated that the defendant hid cocaine under the dashboard of his minivan, in the center console, under a floor mat, and in a wheel well; one of them stated that the defendant usually hid enough cocaine on his person or in his minivan sufficient to supply customers for one ‘day or night.’ ” Id. at 814. There were also two undercover purchases from the defendant, who drove the vehicle to both occasions and, on the second, was seen to retrieve cocaine from a hiding place under the dashboard. Id. at 815. Finally, there were the facts that the warrant was issued two days after the defendant’s return from a trip to New York, and that “[t]he police had specific, detailed information from informants that the defendant went to New York periodically to purchase cocaine and that he ordinarily remained there a day or two before returning to” Massachusetts. Id. at 815-16.
These cases are, of course, highly fact-specific. In the case before me, there was ample evidence that the defendant — whose place of residence was unspecified — used the Camry to meet buyers, and eveiy reason to believe that drugs would be found in the car whenever he was on his way to such a meeting. There was, however, no information suggesting that the defendant used his car for short-or long-term inventory storage, no reason to assume this,[3] and no other reason to suppose that drugs or other evidence would be located within it at whatever unspecified time that the warrant might be executed. There was, in short, no more in this case than in Wade.
An anticipatory warrant, to be executed as the defendant was driving to the next controlled buy (as in Staines), would surely have sufficed. Alternatively, *646 surveillance of the defendant might have established that he had received and responded to telephone orders without stopping somewhere to get drugs; or that he had been observed prowling Cambridge for prolonged periods during which he engaged in apparent drug transactions without going to a stash location; or even that he had arrived at the controlled buys in less time than it would have taken to get there from his home (if its location were ascertained), it might have been enough.
Nothing in the affidavit, however, suggested that drugs would be located within the Camry except when the defendant was driving to a delivery, and nothing in the warrant required that it be executed on such an occasion. Under the Wade decision, therefore, the motion to suppress the search of the vehicle must be allowed.
The same concerns apply to the search of the defendant’s person. The evidence that the defendant was a drug dealer by trade did not amount to probable cause to believe that he would, anywhere and at any time, be carrying contraband or evidence of crime around in his pockets.
ORDER
For the foregoing reasons, the Defendant’s Motion to Suppress Evidence is ALLOWED.

 In the first motion he was joined by the driver of the Honda, co-defendant Endalew Kahassay.

 The affidavit discreetly referred to the informants using the neuter pronoun; I adopt the masculine pronoun here for convenience only.

 A drug dealer with some familiarity with the practices and governing rules of narcotics enforcement might well view his automobile as a riskier storage place than his home. See, e.g., Commonwealth v. Eggleston, 453 Mass. 554, 557-61 (2009), on the “automobile exception” to the warrant requirement, and Commonwealth v. Feyenord, 445 Mass. 72, 79-82 (2005), cert. denied, 546 U.S. 1187 (2006), on the permissible use of drug-sniffing dogs in motor vehicle stops.