## Commonwealth *vs.* Jose M. Escalera.

No. 08-P-517.

Plymouth. October 7, 2009. - April 14, 2011.

Present: Berry, Grainger, & Wolohojian, JJ.

Further appellate review granted, 460 Mass. 1101 (2011).

*Controlled Substances. Firearms. Evidence,* Ballistician's certificate, Certificate of drug analysis. *Constitutional Law,* Confrontation of witnesses, Harmless error, Search and seizure. *Error, Harmless. Probable Cause. Search and Seizure,* Probable cause, Affidavit. *Practice, Criminal,* Confrontation of witnesses, Harmless error.

At the trial of indictments charging the defendant with drug and firearm offenses, the erroneous admission of certificates of drug and ballistics analysis without live testimony by the technicians who performed the tests was not harmless beyond a reasonable doubt, where there was little, if any, evidence to prove the nature of the substances or the operability of the firearms; however, the admission of a certificate of ballistics analysis with respect to the charge of possession of ammunition without a firearm identification card was harmless beyond a reasonable doubt, where the cartridges themselves and the testimony of a police officer that they were found in the gun at the time it was seized provided overwhelming evidence that the cartridges met the statutory definition of ammunition. [263-265]

A Superior Court judge did not err in denying the criminal defendant's pretrial motion to suppress evidence seized from his residence pursuant to a search warrant, where the facts set forth in the affidavit accompanying the application for the warrant provided a sufficient nexus between the defendant's residence and his drug-selling activities to establish probable cause to search the residence. [265-268] Grainger, J., concurring. Berry, J., dissenting.

At a criminal trial, no error arose from the admission of evidence seized from the basement of the defendant's residence, where the defendant did not have an objectively reasonable expectation of privacy in the basement, to which the landlord also had full access, and where the evidence was sufficient to permit the jury to find beyond a reasonable doubt that the defendant had constructive possession of the items in the basement. [268]

Indictments found and returned in the Superior Court Department on July 29, 2005; September 2, 2005; and April 21, 2006, respectively.

A pretrial motion to suppress evidence was heard by *Joseph M. Walker, III*, J., and the cases were tried before *Charles M. Grabau*, J.

*William T. Harrington* for the defendant.

*Christine M. Kiggen*, Assistant District Attorney, for the Commonwealth.

WOLOHOJIAN, J. The defendant raises two primary issues in this appeal from his convictions of various drug and firearm offenses.[1] First, he argues that admission of certificates of drug and ballistics analysis, absent live testimony, violated his right to confrontation pursuant to the Sixth Amendment to the United States Constitution. Second, the defendant contends that evidence seized from his residence should have been suppressed for lack of probable cause. We reverse all but the ammunition conviction given the error in admitting the certificates. But because we conclude that there was probable cause to search the defendant's residence, we remand for new trial on those charges.

1. *Sixth Amendment.* Ballistics and drug certificates were admitted at trial over the defendant's objection. There is no doubt that their admission, absent live testimony or the opportunity to cross-examine, violated the confrontation clause of the Sixth Amendment. *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009). We review, therefore, to determine whether the admission of the certificates was harmless beyond a reasonable doubt. "Our review presumes that the constitutional violation requires reversal, but an affirmative showing of harmlessness beyond a reasonable doubt by the Commonwealth will preserve the convictions." *Commonwealth* v. *Fluellen*, 456 Mass. 517, 526 (2010). "In considering the essential question whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the verdicts, our focus is not on whether the jury could have convicted the defendant had the tainted evidence been excluded; it is not

---

[1]The defendant was convicted of trafficking in heroin (G. L. c. 94C, § 32E[*c*]); doing so in a school zone (G. L. c. 94C, § 32J); distributing cocaine (G. L. c. 94C, § 32A[*c*]); doing so in a school zone (G. L. c. 94C, § 32J); two counts of possession of a firearm or ammunition without a firearm identification (FID) card (subsequent offense) (G. L. c. 269, § 10[*h*]); and one count of possession of ammunition without an FID card (G. L. c. 269, § 10[*h*]).

enough for the Commonwealth to demonstrate that its other, properly admitted evidence was sufficient to convict the defendant or that the inadmissible evidence was consistent with the admissible evidence. Rather, we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010) (quotations and citations omitted). See *Chapman* v. *California*, 386 U.S. 18, 23-24 (1967).

The Commonwealth primarily argues that the erroneous admission of the certificates was harmless beyond a reasonable doubt because neither the composition of the narcotics nor the operability of the firearms were "live" issues at trial. This, however, is not enough where, as here, there was little (if any) evidence to prove the nature of the substances or the operability of the firearms. See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 368 (2010); *Commonwealth* v. *Charles*, 456 Mass. 378, 383 (2010). Even if a defendant does not contest the composition of the alleged drugs, or the operability of a firearm, the "defendant's theory of his case cannot relieve the Commonwealth of its burden of proving every element of a crime beyond a reasonable doubt." *Commonwealth* v. *Shea*, 398 Mass. 264, 269 (1986). Nor does the fact that defense counsel at various points referred to the objects as a "gun," or heroin, or cocaine satisfy the Commonwealth's burden of proving the guns' operability or the substances' composition.[2] *Commonwealth* v. *Charles*, 456 Mass. at 383.

That said, we conclude based on *Commonwealth* v. *Muniz,*

---

[2] The Commonwealth's evidence was not of such strength that the admission of the certificates was harmless beyond a reasonable doubt. As to the guns, while there was evidence that one of the guns was loaded, there was no evidence that it had actually been fired. See *Commonwealth* v. *Hollister*, 75 Mass. App. Ct. 729, 732-733 (2009). Contrast *Commonwealth* v. *Mendes*, 75 Mass. App. Ct. 390, 397 (2009) ("The strength of the independent evidence of the operability of the handgun shows beyond a reasonable doubt the harmlessness of the admission of the certificate. That independent evidence included testimony of three audible shots, the three empty casings, and the smell of gunpowder"). As to the drugs, there was no expert testimony as to their composition, there was no field testing, and there was no other direct evidence as to composition.

456 Mass. 166, 172-173 (2010), that the admission of the certificate of ballistics analysis with respect to the ammunition charge was harmless beyond a reasonable doubt. The crime of unlawful possession of ammunition requires the Commonwealth to show that the bullets found in the defendant's firearm were "designed for use in any firearm." G. L. c. 140, § 121. Here, as in *Muniz*, 456 Mass. at 171, the Commonwealth introduced in evidence the gun and the rounds found inside the gun when it was seized. A police officer testified at trial that the rounds were found inside the gun. "The cartridges themselves and the officer's testimony that they were found . . . in the gun at the time it was seized[] provide overwhelming evidence that the cartridges met the statutory definition of ammunition." *Id.* at 173.

2. *Motion to suppress.* The defendant argues that the affidavit supporting the application for a search warrant did not set forth a "nexus" with his residence sufficient to establish probable cause. To determine whether a sufficient nexus has been made out, we read the affidavit as a whole, without isolating or deconstructing its individual parts, or subjecting it to strained or hypercritical analysis. See *Commonwealth* v. *Blake*, 413 Mass. 823, 827 (1992). "The nexus may be found in 'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide' the drugs he sells." *Commonwealth* v. *O'Day*, 440 Mass. 296, 302 (2003), quoting from *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 484 U.S. 860 (1983).

"When that location is a residence, there must be specific information in the affidavit, and reasonable inferences a magistrate may draw, to provide 'a sufficient nexus between the defendant's drug-selling activity and his residence to establish probable cause to search the residence.' " *Commonwealth* v. *Pina*, 453 Mass. 438, 440-441 (2009), quoting from *Commonwealth* v. *O'Day*, 440 Mass. at 304 (single observation of drug dealer leaving his residence to go to drug transaction did not provide sufficient nexus). "Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence." *Commonwealth* v.

*Cinelli*, 389 Mass. at 213. "It follows that probable cause to expect that drugs will be present in a home is not established by the fact that the defendant lives there." *Commonwealth* v. *Pina*, 453 Mass. at 441. Just as residency alone does not establish probable cause, "the fact that a defendant drives from his home to the location of a drug transaction, and returns to his home on the transaction's conclusion, *with no other facts* connecting the residence to drug sales, does not provide probable cause to search the residence" (emphasis added). *Commonwealth* v. *Medina*, 453 Mass. 1011, 1011 (2009), quoting from *Commonwealth* v. *Pina*, 453 Mass. at 441 (single round trip to and from drug transaction did not establish probable cause to search residence). Among the infinite variety of additional facts human behavior can provide (together with the reasonable inferences to be drawn from them) to establish probable cause to search a residence, one cannot exclude a drug dealer's pattern of leaving and returning to his residence for each drug sale. A pattern of repeated activity giving rise to a reasonable inference that a dealer's residence is being used as the base for his drug operation provides sufficient nexus to search his residence.

Summarized, the facts in the affidavit in this case were as follows. A confidential informant (CI) told police that he (a pronoun used for convenience, not to signify gender) knew of a heroin dealer in Brockton who used two different automobiles (one a white Toyota, the other a green Audi with fancy wheels) to deliver drugs to prearranged locations. Using this information, the police worked with the CI to make four controlled purchases of heroin over the next two weeks. On each of these occasions, the CI called the defendant by telephone and asked for a specific quantity of drugs. The defendant then specified the location at which to meet. The defendant arrived by car (either the white Toyota or the green Audi) and picked up the CI. He drove a short distance with the CI in the car, during which a sale of heroin took place. The CI was then let out of the car. After each of these sales, the defendant drove directly to his residence, and parked the car in the parking lot. He then entered the house through its rear entrance, located near the basement. In addition, on one of these occasions, police observed the defendant drive the Toyota away from his residence a few

minutes after arranging a sale by telephone with the CI. The defendant then drove directly to the prearranged location where he sold drugs to the CI.

On two additional occasions during the same two-week period, the defendant was observed to leave his residence, get directly into the Audi, and drive to a location where he picked up a woman, drove a short distance, and then dropped her off. He returned directly to his residence. This behavior was in all material respects identical to the defendant's modus operandi in the controlled purchases and it takes no leap of imagination to infer that these too were drug transactions.[3] See *Commonwealth* v. *Santiago*, 452 Mass. 573, 576 (2008), quoting from *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002) ("affidavits in support of search warrants are to be approached with a view toward common sense, read in their entirety and with considerable latitude allowed for the drawing of inferences"). On the first of these two occasions, the defendant took counter measures while driving to ensure he was not followed. Also on this occasion, after parking the Audi when he returned home, he opened the driver's door of the Toyota and then its hood. After looking around to ensure he was not being watched, he either took something from the engine compartment or placed something in it. He then went inside his residence, using the rear door.

In summary, the defendant was seen leaving and returning to his residence multiple times to what were either known drug sales or to encounters that could readily be inferred to be drug transactions. A pattern of activity such as this, in our view, provides sufficient nexus to a dealer's residence to satisfy probable cause to search it. In addition, the defendant's use of multiple cars makes it more likely that he stored drugs in his residence, rather than in the vehicles. Moreover, whatever the defendant was storing in the engine compartment of the Toyota, he had no need to access it on the way *to* a sale. Rather, that material was either deposited into the compartment after a sale or taken from the compartment into his house. Either way, it bolsters the inference that drugs were stored in the house, rather than in the vehicles. Furthermore, the defendant always used the rear

---

[3]It was also completely consistent with the defendant's modus operandi as described by the CI when he first met with police.

entrance to the house, and the landlord confirmed that the occupants of the defendant's apartment were the only people (in addition to the owner) who had access to the locked basement and a locked storage container that were located at the rear of the house.

The defendant's motion to suppress was properly denied.

3. *Other issues.* We address briefly the other issues raised by the defendant. The judge correctly determined that the defendant did not have an objectively reasonable expectation of privacy in the basement to which the landlord also had full access. See *Commonwealth* v. *Williams*, 453 Mass. 203, 208-209 (2009) (and cases cited therein). Finally, there was no error in denying the defendant's motion for a required finding of not guilty regarding the charges based on items discovered in the basement. The evidence, taken in the light most favorable to the Commonwealth, was sufficient to allow a jury to find, beyond a reasonable doubt, that the defendant had constructive possession over the items in the basement.

For the reasons set forth above, the defendant's conviction of possession of ammunition (indictment no. 06-00182-003) is affirmed. The judgments on the other indictments are reversed, the verdicts are set aside, and the cases are remanded to the Superior Court for a new trial.

*So ordered.*

GRAINGER, J. (concurring). I write separately because our case law on the issue of nexus and probable cause no longer appears to provide useful precedent. This case illustrates that certain assumptions underlying our rescript decision in *Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907 (2003), and thereafter adopted by the Supreme Judicial Court in *Commonwealth* v. *Pina*, 453 Mass. 438 (2009), and *Commonwealth* v. *Medina*, 453 Mass. 1011 (2009), would benefit from reexamination.[1]

A known drug dealer is observed leaving his residence,

---

[1]*Smith, supra,* involved two surveilled controlled purchases during which the defendant was observed leaving his house to meet the confidential informant on one occasion and returning home after the other, but never both. *Pina,*

proceeding directly to a controlled buy, and then returning directly home. This does not establish to a certainty that the drugs which were sold under surveillance were retrieved from a supply kept at the residence — but it provides a rational observer with a reasonable basis to consider it probable.

The term "probable cause" is not defined in either the Federal Constitution or our Declaration of Rights. *Commonwealth* v. *O'Day*, 440 Mass 296, 300 (2003). "Probable" refers to an inference "that can reasonably be expected or believed on the basis of the available evidence, though not proved or certain." Webster's New Universal Unabridged Dictionary 1433 (2d ed. 1983). "[F]or there to be probable cause, the facts must be such as would warrant a belief by a reasonable man." Black's Law Dictionary 1321 (9th ed. 2009), quoting from LaFave and Israel, Criminal Procedure § 3.3 at 140 (2d ed. 1992).

Our task therefore has been, and remains, to apply "probable" in a continuum somewhere between possible and certain. The variation in background and circumstances presented by each successive case has resulted in appellate pronouncements relying on ever finer factual distinctions employed to support a particular result for that case; police, prosecutors, defense counsel, magistrates and judges are consequently deprived of useful guidance.

Probability does not require the elimination of competing explanations; that would be certainty. In many cases, including this one, the competing explanations to be derived from observed facts are that the defendant kept drugs in a car or on his person, rather than in his home. The existence of these alternatives would not remove a basis to search the defendant's home in my opinion, even if they claimed parity with the probability of drug storage in the home. But they do not: cars and other vehicles

*supra* at 441-442, citing *Smith* with approval, involved a defendant observed leaving his residence and proceeding directly to a prearranged drug transaction, but apparently not followed thereafter. *Medina, supra* at 1011, citing both with approval, involved a surveilled round trip. As the dissent in *Pina* points out, see *Commonwealth* v. *Pina*, 438 Mass. at 443 n.1 (Cordy, J., dissenting), the first step in this sequence, *Smith*, relies on our prior decision in *Commonwealth* v. *O'Day*, 56 Mass. App. Ct. 833 (2002), but in that case, the Supreme Judicial Court reached a contrary conclusion on further appellate review, see *Commonwealth* v. *O'Day*, 440 Mass. 296 (2003).

are less private and less secure than buildings, while keeping drugs on one's person removes the ability to disclaim ownership. However, having denied for legal purposes what a reasonable person[2] would consider self-evident, we have been required to embark on a search for additional indicia of residential drug storage that are generally less convincing than the round-trip controlled purchase properly surveilled from portal to portal. Not surprisingly, consensus has eluded us.

As in this case, reasonable judges can and do differ on the significance of using the same entrance to a building, engaging in activity which looks like a drug transaction but might be something else, registering utilities in one's own name or some-one else's, raising the hood of a car on one occasion but not on another, and so forth. Having denied the inference properly drawn from the stronger evidence, we seek to remedy the short-fall with a collection of the weaker. At some point, of course, a large accumulation of facts with weak import may be said to provide a critical mass, but this approach is unsatisfactory in my view and in any event does not often present itself for ap-pellate review.

In sum, I believe the majority and dissent reach equally defensible results, depending largely on how one chooses to interpret the mandate for additional "particularized informa-tion" required by *Pina, supra* at 442. Under these circumstances, because I consider probable cause to have been demonstrated, I join in the result reached by the majority.

BERRY, J. (dissenting in part). Respectfully, I dissent because I believe that on the current state of the law, the cases of *Commonwealth* v. *Pina*, 453 Mass. 438 (2009), and *Commonwealth* v. *Medina*, 453 Mass. 1011 (2009), control this case. See part 1, *infra.*

I also dissent because I do not believe that, within the four corners of the search warrant affidavit, a probable cause nexus

---

[2]"The point of the Fourth Amendment [to the United States Constitution] . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence." *United States* v. *Ventresca*, 380 U.S. 102, 106 (1965), quoting from *Johnson* v. *United States*, 333 U.S. 10, 13-14 (1948).

to the apartment building in which the defendant lived was established. See part 2, *infra.* While the affidavit suggests suspicion that heroin may have been stored in the defendant's apartment building, a hunch is not enough under the particularized probable cause requirements of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. "In each case, the basic question for the magistrate is whether he has a *substantial basis* for concluding that any of the articles described in the warrant are probably in the place to be searched" (emphasis added). *Commonwealth* v. *Upton,* 394 Mass. 363, 370 (1985). Here, reduced to essentials, the search warrant affidavit describes four small heroin controlled buys by an informant — three "ones" for forty or sixty dollars, and a "two" for $100. All the buys occurred by way of automobile deliveries by the defendant, away from the apartment building.[1] *Nothing* is set forth in the affidavit that *directly* ties these four drug sales to the apartment building. Indeed (as further detailed herein), from all that appears in the affidavit, it was two automobiles, an Audi and a Toyota, that presented as most probably "the place to be searched" for any stored heroin. *Id.* at 370. Beyond these inadequacies, the omissions in the affidavit here are telling when compared to the search warrant affidavit that was found to establish probable cause nexus to a residence in *Commonwealth* v. *O'Day,* 440 Mass. 296 (2003). See part 2, *infra.*

1. Turning to the first basis of this dissent, I believe this court is bound to apply the controlling precedent of *Pina, supra,* and *Medina, supra.*[2] The Supreme Judicial Court "is the highest appellate authority in the Commonwealth, and [its] decisions on

---

[1] The defendant's trial was based entirely on the heroin, cocaine, and firearms and ammunition seized under the warrant from within the defendant's apartment and the basement of the apartment building. The four controlled buys were not the subject of indictments — it would appear because of informant confidentiality — and in a bench conference prior to the beginning of trial, the prosecutor represented that there would be no evidence elicited concerning the controlled buys.

[2] I agree with the concurrence that *Pina, supra,* and *Medina, supra,* are worthy of reconsideration and refinement by the Supreme Judicial Court. The holding in *Pina* was subject to a dissent by two Supreme Judicial Court justices, and the same justices dissented in *Medina.* The *Pina-Medina* line of analysis has had a marked influence and has been followed in a number of decisions of this court, both published and unpublished.

all questions of law are conclusive on all Massachusetts trial courts and the Appeals Court." *Commonwealth* v. *Vasquez*, 456 Mass. 350, 356 (2010).

Here, as in *Pina* and *Medina*, there was only one transaction in which the investigators had set up surveillance at the defendant's apartment building and saw the defendant drive from the parking lot to the site prearranged with the informant, sell the "two" to the informant for $100, and then drive back to the apartment building. In the other three transactions, there was no such point of origin surveillance. Thus, in three of the four deals, it was unknown where the defendant originally came from in order to reach the prearranged site, and the affidavit does not state, nor could it state, that the defendant's point of origin before driving to the prearranged site was the apartment building.[3]

In *Pina*, 453 Mass. at 442, the Supreme Judicial Court held that "a single observation of the defendant driving from the apartment to a location where he sold an unspecified quantity of cocaine to the informant" did not constitute[4] "specific allegations, or particularized information based on police surveillance or otherwise, that would permit a reasonable inference that the defendant likely kept a supply of drugs in his apartment."

Furthermore, in *Pina* — so too, in this case — there are *no* other connective factors that link to the apartment building. That is, like the *Pina* affidavit, this affidavit did *not* include "details about the amount and quantity of drugs the defendant

---

[3]There was no police surveillance established at the defendant's apartment before three of the informant's controlled buys. This is so despite the fact that the informant set up the four drug transactions by speaking with the defendant by telephone and that the police witnessed the calls. After these calls, the police could easily have covered the apartment building in a predelivery surveillance. Law enforcement did not do so. Yet the majority fills in the missing steps and draws a link back that is nonexistent because of inadequate police surveillance practice.

[4]Further making clear that one round trip from a residence to a drug transaction site is not enough to establish probable cause nexus, in *Pina*, 453 Mass. at 441, the Supreme Judicial Court cited with approval the holding in *Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907 (2003), stating, "[w]e agree with the Appeals Court's analysis" "that the fact that a defendant drives from his home to the location of a drug transaction, and returns to his home on the transaction's conclusion, with no other facts connecting the residence to drug sales, does not provide probable cause to search the residence."

had sold in the past, or any other facts tending to demonstrate that the defendant sold drugs from his apartment or that he kept a supply of drugs there." *Ibid.* Given the foregoing, and following the *Pina* analysis, the affidavit here — with only one surveilled round trip from the defendant's apartment building parking lot to the prearranged site — does *not* demonstrate, by particularized probable cause, a nexus to the apartment building as a place with "a substantial basis" to be the location of a supply of heroin.

The court's analysis in the *Medina* case confirms the *Pina* rejection of one round trip as a predicate for probable cause nexus to a residence. In *Medina*, 453 Mass. at 1011, the court wrote as follows:

> "[In the *Pina* case], we reiterated the principle that evidence establishing that a person may be guilty of illicit drug activity does not necessarily establish probable cause to search that person's residence for drugs. . . . The affidavit before us contains the following information linking the defendant's drug activity to his apartment: (1) he drove from the apartment to a prearranged location where he sold cocaine to a police informant; and (2) after the sale, he drove back to his apartment. The obvious flaw, as was the case in the *Pina* and [*Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907 (2003),] decisions, is that the affidavit lacks the requisite nexus between the items to be searched for (drugs and drug paraphernalia) and the place to be searched (the defendant's apartment) to constitute probable cause to search."

In sum, in this case, when one applies the analysis that one round-trip surveillance of a drug sale is insufficient, see *Pina*, *supra*, and *Medina*, *supra*, as this court is bound to do, there are only blanks, *not* connective dots, in the affidavit, leaving no probable cause nexus between the apartment building and the defendant's four small sales of heroin in offsite car transactions. Accordingly, I dissent from the majority holding in light of the *Pina-Medina* precedent.

2. Second, I dissent because, even apart from the *Pina-Medina* precedent, I am not persuaded that, within the four corners of

the affidavit, the constitutional standard of particularized probable cause was met. "[T]he sufficiency of the search warrant application always begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. at 297, quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). "The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment was designed to circumscribe by the general requirement of a judicial determination of probable cause." *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975). Accordingly, where the place to be searched is a residence, the affidavit must include specific information and reasonable inferences a magistrate may draw to provide "a sufficient nexus between the defendant's drug-selling activity and his residence to establish probable cause to search the residence." *Commonwealth* v. *O'Day*, 440 Mass. at 304. That nexus is not established here.

To the contrary, if one looks within the four corners of this affidavit, there is only a broken line that cannot connect probable cause to the apartment building. (Compare the *O'Day* case, discussed *infra*.) In this case, there is *no* indication that the informant ever saw drugs in the defendant's apartment building. There is *no* surveillance indicating that drugs were sold by the defendant from within the apartment building. There is *no* indication that the defendant was within the apartment when the sales were set up by the informant's telephone calls. There is *no* indication that the defendant ever carried anything from the apartment building. And as previously noted, there is *nothing* in the affidavit about the defendant leaving the apartment building prior to three of the four controlled buys. Indeed, the only round-trip surveillance refers to the defendant driving from the parking lot[5] — it appears that the police did not see the defendant leave the building, and did not see his actions with respect

---

[5]The majority is incorrect in stating that "on one of these occasions, police observed the defendant drive the Toyota away from his residence a few minutes after arranging a sale by telephone with the CI. The defendant then drove directly to the prearranged location where he sold drugs to the CI." *Ante* at 266-267.

to the Audi and Toyota cars before he left the parking lot — a point of import, to which I now turn.

From all that appears in the affidavit, it was more probable that the heroin was stored in the interchangeable Audi and Toyota cars, which the defendant drove to the prearranged heroin dealing sites. On that point, I note that in two separate surveillances (not part of the four controlled sales to the informant), the police observed the defendant engaging in unusual activity that indicated he was placing something into or moving something around between the Audi and the Toyota. During one such surveillance conducted on April 1, 2005, detectives observed the defendant, accompanied by an unidentified heavyset Hispanic man, exit the rear of the apartment building, and enter the green Audi. The defendant drove in an evasive manner. The Audi was met by an unidentified man and woman. The woman entered the Audi, and after a short ride, was dropped off. Upon return to the apartment building parking lot, the defendant exited the Audi, walked over to the Toyota, and looked about to see if he were being watched. The defendant entered the Toyota, and opened the engine hood. Again, the defendant looked around to see if he were being watched. The defendant either placed something in, or took something out of, the Toyota engine compartment. Then, the defendant moved the Toyota to a spot that blocked the Audi. In another such surveillance, on April 4, 2005, the police observed the defendant exit the rear of the apartment building and walk directly to the Audi, which he opened with a key. The defendant drove the Audi to meet with an unidentified female, who entered the Audi, and was dropped off after a short ride. When he returned to the apartment parking lot, the defendant again exited the Audi, and used another key to unlock the Toyota. The defendant went into the Toyota's interior for a brief time.[6]

Further indicating that the defendant used the two cars as

[6]It is suggested by the majority that the defendant's conduct during these two other surveillance, though not involving controlled buys, mirrors the defendant's pattern of conduct during the four controlled buys, and that an inference could be stretched that the defendant had a pattern of driving from the apartment as a point of origin to a prearranged location. However, *Pina*, 453 Mass. at 442, undercuts reliance on such a common course of conduct and pattern, stating, "The information, nevertheless, that a defendant's actions

tools of his trade, the defendant masked his connection to the two cars. The Audi was registered in the defendant's girlfriend's name and the Toyota was registered to another individual, who had a heroin distribution criminal record. This pattern suggests that the two cars were being used not only to transport, but also to store, heroin. It is reasonable to infer that the defendant engaged in a shell game of driving one car to the prearranged site, while using the other car as a storage location, and then alternating the cases and the cars' purposes. There were far more probable cause connections to the cars, as described in the affidavit, than in the scant descriptions associated with the apartment building.

The majority looks to *Commonwealth* v. *O'Day*, 440 Mass. 296, as support for a probable cause nexus to the apartment building. In my opinion, the *O'Day* case tends to demonstrate no such probable cause. In *O'Day*, the only significant affidavit information similar to this case is that there were three controlled buys by an informant. But, in most other material respects, the *O'Day* case is markedly different because the *O'Day* search warrant affidavit had many more links to the residence than are present in this case.

Most significantly, in the *O'Day* case, the Supreme Judicial Court cited two police surveillances indicating sales from within O'Day's residence as establishing probable cause that controlled substances were stored in that residence. In one police surveillance of O'Day's residence, the officers saw a number of visitors arrive and depart after a very brief stay. *Commonwealth* v. *O'Day*, *supra* at 299. Given the quick visits by this series of individuals to O'Day's residence, the affidavit included a police officer's expert opinion that the behavior was "consistent with narcotics distribution." *Ibid.* A second police surveillance of O'Day's residence confirmed "the same pattern of visitors to the defendant's residence as on the previous occasion: 'several vehicles that arrived and departed . . . after a brief stay.' " *Id.* at 300. *It was* this parade of visitors briefly entering and exiting O'Day's residence that the Supreme Judicial Court found criti-

may be consistent with a commonly known type of drug delivery services does not, without more, create a sufficient probability that this particular defendant kept a supply of drugs at his home."

cal in the probable cause calculus of nexus to the residence. *It was not* the informant's three controlled buys from O'Day away from O'Day's residence that established the connection. To that end, the court made clear in *O'Day* that "the details provided by the confidential informant, standing alone, did *not* establish a nexus between [O'Day's] drug activity and his residence, [it was rather] the additional information gathered by the State troopers during their surveillance and investigation [that] established probable cause" (emphasis added). *Id.* at 302. In contrast, in this case, virtually all of the argument for nexus to the apartment rests on the four controlled buys away from the apartment building.

In further contrast to the *O'Day* case, here, there was *no* information in the affidavit that the defendant was using the apartment to sell drugs to random and brief visitors. Nor did the affidavit contain corroborative investigative information linking the residence to illegal conduct, such as was set forth in the *O'Day* affidavit. To illustrate the major differences: as set forth in the *O'Day* affidavit (beyond the sales at the residence already described), the investigation also revealed a series of sales by O'Day to a number of buyers at the pub where he worked. In this respect, the *O'Day* affidavit refers to one pub surveillance where there were "a series of exchanges beneath a table in the bar [between O'Day and] several individuals." *Id.* at 229. In another surveillance at the pub, there were several police observations of potential buyers going into the men's room with O'Day for a short period of time, as if a deal had just occurred. *Id.* at 300. Given all of this additional information — *beyond* the three controlled buys to the informant — the Supreme Judicial Court in *O'Day* concluded that the number of transactions and quantity of drugs being sold on divers dates by the O'Day enterprise gave rise to probable cause that cocaine was stored at O'Day's residence. Specifically, the *O'Day* court wrote as follows:

> "During two surveillances, the defendant was observed departing from his residence in his truck, proceeding directly to [the pub], and engaging therein in what appeared to be drug transactions. The reasonable inference was that the defendant brought a substantial quantity of

drugs with him to the pub. It was unlikely that the defendant obtained the drugs from within the bar, as the defendant argues, or from any other location because he was constantly watched by the officers. It appeared that the drugs were transported in the truck, to which he returned to replenish his supply. *Given the value of drugs, the quantity the defendant sold each evening in the pub, and the frequency of visitors to his home, it was unlikely that the defendant would keep so large a supply of drugs in the truck while at home"* (emphasis added).

*Id.* at 303.

*None* of this is present in the affidavit in this case. Unlike the *O'Day* case, there are no sales by the defendant other than the four controlled buys. There is not, in this case, a large number of buys or substantial drug sales. There is no evidence of a large-scale drug enterprise. Rather, what the search warrant affidavit devolves to is four "small time" controlled buys by an informant: (1) a buy of "one" for forty dollars on March 28, 2005; (2) a buy of "one" for sixty dollars on March 29, 2005; (3) a buy of "two" for $100 on April 4, 2005; and (4) a buy of "one" for sixty dollars on April 8, 2005. (As previously referenced, see note 1, *supra*, these four controlled buys were not a part of the trial, and not the basis for any of the defendant's convictions.)

Because the trial was based on the heroin, cocaine, and guns and ammunition seized under the warrant, and not the controlled buys by the informant, it is true that allowance of the defendant's motion to suppress on the basis that the search warrant affidavit did not establish probable cause nexus to the apartment building means that a man who had a large cache of heroin (30.96 grams), a smaller, but not insignificant, amount of cocaine, and handguns will have his convictions vacated.[7] That is troubling, especially since had there been more targeted law

---

[7] In the defendant's apartment, the police seized paperwork, $238 in cash, cellular telephones, a black gun shoulder holster, eight small bags of cocaine, and a digital scale. In the basement area, the police seized two handguns, several rounds of ammunition, and 30.96 grams of heroin.

Based on the evidence seized under the warrant, the defendant was convicted of trafficking in heroin, G. L. c. 94C, § 32E(*c*); distribution of cocaine, G. L. c. 94C, § 32A(*c*); two violations of the "school zone" law, relative to the

enforcement surveillance — such as establishing a surveillance point at the apartment building prior to the four controlled buys, watching the defendant's activities on more occasions than was done here, and undertaking additional, corroborative investigative work in this case — gaps would have been filled, and a probable cause nexus may very well have been built into the search warrant affidavit with connections to the defendant's apartment building. But courts must not fill in probable cause blanks. Thus, although this dissent would lead to an untoward end in that a large amount of drugs and guns would be suppressed under the exclusionary rule, in the final judicial analysis, I set the lodestar for this dissent in the words that resonate with fundamental constitutional power in the Fourth Amendment[8] and art. 14.[9] "[C]onviction by means of unlawful seizures and enforced confessions . . . should find no sanction in the judgments of the courts . . . . The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." *Weeks* v. *United States*, 232 U.S. 383, 392-393 (1914). Accord *Mapp* v. *Ohio*, 367 U.S. 643, 655 (1961) (holding the Fourth Amendment exclusionary rule applicable to the States).

---

heroin and cocaine, G. L. c. 94C, § 32J; and three counts of unlawfully possessing a firearm or ammunition in violation of G. L. c. 269, § 10(*h*), with two such firearm offenses being subsequent offenses.

[8]The Fourth Amendment states as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[9]Article 14 states as follows:

"Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws."

For all of the reasons set forth herein, I dissent from the majority's holding that the search warrant affidavit established a probable cause nexus to the defendant's apartment building.[10]

---

[10]I concur in the majority decision that the introduction of the certificates of drug analysis at the defendant's trial was not harmless beyond a reasonable doubt. See *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009); *Commonwealth* v. *Vasquez*, 456 Mass. at 358-359.