COMMONWEALTH *vs.* HEATHER LUTHY
(and a companion case[1]).

No. 06-P-889.

Bristol. February 8, 2007. - May 18, 2007.

Present: GELINAS, McHUGH, & KATZMANN, JJ.

*Controlled Substances. Constitutional Law,* Search and seizure, Probable
cause. *Search and Seizure,* Probable cause, Affidavit. *Probable Cause.*

A trial court judge erred in allowing a pretrial motion to suppress evidence
seized by police during a search of the residence of criminal defendants,
where the affidavit in support of the search warrant set forth probable
cause to believe that drugs or related evidence from a drug delivery service
were likely to be found there. [105-109]

INDICTMENTS found and returned in the Superior Court Depart-
ment on August 19, 2005.

Pretrial motions to suppress evidence were heard by *Robert
J. Kane,* J.

An application for leave to prosecute an interlocutory appeal
was allowed by *Francis X. Spina,* J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
him to the Appeals Court.

*William R. Connolly,* Assistant District Attorney, for the
Commonwealth.

*John P. Vignone* for Heather Luthy.

*Paul P. Hayes, Jr.,* for Joseph Luthy.

KATZMANN, J. This case presents the question of the quantum
of evidence sufficient to establish probable cause to search the
residence of the principal of a drug delivery service. A grand
jury indicted the defendants, Heather Luthy and Joseph Luthy,

[1] Commonwealth *vs.* Joseph Luthy.

on charges of trafficking in cocaine in excess of 200 grams[2] and conspiracy to violate drug laws.[3] The defendants filed motions to suppress evidence seized at their residence, 909 Pike Avenue, Attleboro. Following a hearing, a Superior Court judge issued a memorandum of decision allowing the defendants' motions on the grounds that the affidavit offered to obtain the search warrant "failed to present information necessary for the magistrate to reasonably conclude that drugs, drug paraphernalia, proceeds, or evidence of drug violations would be found at 909 Pike Avenue, Attleboro." A single justice of the Supreme Judicial Court granted the Commonwealth's application for leave to prosecute an interlocutory appeal of the allowance of the motion to suppress, and the case was transferred to this court. We reverse the order allowing the motion to suppress.

*Background.* Our review of the sufficiency of a search warrant "begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). We summarize the facts recited in the affidavit.

The affiant, Detective Timothy Cook[4] of the Attleboro police department, spoke with Detective James Floyd, an officer of the Plainville police department and a member of the Norfolk County Police Anti-Crime Task Force (NORPAC), during the second week of June, 2005. Detective Floyd informed Detective Cook that a confidential informant, known as Milkman, regularly purchased cocaine from a male suspect, one Joseph Luthy (Luthy) of Attleboro. According to Milkman, Luthy also sold cocaine on "a steady basis" to others.

Milkman explained to Detective Floyd that he obtained cocaine by calling Luthy's cellular telephone and placing an order. Luthy then delivered the drugs to a predetermined location. Milkman further explained that he was a cocaine user, familiar with its pricing and packaging, and that Luthy was able

---

[2]In violation of G. L. c. 94C, § 32E(*b*)(4).

[3]In violation of G. L. c. 94C, § 40.

[4]Detective Cook had spent the previous twenty-seven years as a police officer and the last thirteen as a detective. He has specialized training in criminal and drug investigations and drug identification and has participated in numerous drug investigations.

to provide large quantities of cocaine. In addition, Detective Cook was independently aware that Luthy resided in Attleboro; had been arrested for numerous crimes, including the distribution of unlawful drugs; and was being investigated by the Attleboro police department in relation to narcotics sales in Attleboro.

Detective Floyd arranged for Milkman to conduct a controlled buy with Luthy. To coordinate the buy, Milkman called Luthy's cellular telephone, ordered a "predetermined amount of cocaine," and instructed Luthy to meet him at a set location. Prior to the buy, NORPAC officers conducted a complete body search of Milkman and determined that he did not possess any money or illegal drugs. They then provided Milkman with a "predetermined amount of funds." After dropping Milkman at the location, NORPAC officers kept him under surveillance, during the course of which they observed a white male driving a black GMC Envoy automobile (Massachusetts registration 8337AZ)[5] arrive at the location. NORPAC officers observed Luthy accept funds from Milkman and give Milkman a "white powdery substance packaged in clear plastic believed to be a large amount of cocaine."[6]

Within forty-eight hours of the preparation of the affidavit (submitted June 17, 2002), Detective Cook, in conjunction with Detective Floyd, other NORPAC officers, and agents from the Federal Drug Enforcement Agency, had Milkman conduct a second controlled buy from Luthy. Milkman followed the same procedure in contacting Luthy, i.e., calling Luthy's cellular telephone, ordering a predetermined amount of cocaine, setting a meeting location, and submitting to a body search. Following the telephone call, a white male identified as Luthy was observed leaving 909 Pike Avenue and entering the same black GMC Envoy. The vehicle was "kept" under "visual surveillance" as it drove away from 909 Pike Avenue.[7]

Luthy was subsequently observed arriving at the location and

---

[5]The vehicle was registered to Luthy at 909 Pike Avenue, Attleboro.

[6]Detective Cook's affidavit indicates that the amount of the powdery substance was consistent with the amount of funds used in the purchase.

[7]While the affidavit does not state explicitly that Luthy drove the vehicle directly from 909 Pike Avenue to the controlled buy, the judge credited the affidavit as being sufficient to support an inference that Luthy took cocaine from 909 Pike Avenue. The judge observed that "[a]voiding the temptation of

giving Milkman what Detective Cook described to be a "large amount" of a "white powdery substance packaged in clear plastic" in exchange for the "predetermined amount" of NOR-PAC funds. The officers then observed Luthy as he returned to 909 Pike Avenue, parked the vehicle, and entered the house.

Based on this information, Detective Cook alleged in the affidavit that there was probable cause to believe that cocaine, drug paraphernalia, transaction records, and drug-related monies were concealed at 909 Pike Avenue. The search warrant issued and was executed on June 17, 2002.

*Discussion.* The Commonwealth appeals the judge's ruling that the search warrant affidavit lacked the necessary nexus between the defendant, the criminal activity, and the location to be searched. We conclude that the affidavit did establish the necessary nexus.

The central inquiry is whether the affidavit accompanying the search warrant sets forth probable cause to believe that the drugs or related evidence from the drug delivery service are likely to be found at the defendants' residence. See *Commonwealth* v. *O'Day,* 440 Mass. at 300; *Commonwealth* v. *Santiago,* 66 Mass. App. Ct. 515, 521 (2006). As such, "[t]he information in the affidavit must be adequate to establish a timely nexus between the defendant and the location to be searched and to permit the determination that the particular items of criminal activity sought reasonably could be expected to be found there." *Commonwealth* v. *Gallagher,* 68 Mass. App. Ct. 56, 59 (2007), quoting from *Commonwealth* v. *Eller,* 66 Mass. App. Ct. 564, 565 (2006). See Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 8-2[d][5] (2006-2007). "The connection between the items to be seized and the place to be searched does not have to be based on direct observations; it may be found by looking at the type of crime, nature of the items, the suspect's opportunity to conceal items, and inferences as to where the items are likely to be hidden." *Commonwealth* v. *Gallagher, supra,* quoting from *Commonwealth* v. *Olivares,* 30 Mass. App. Ct. 596, 600 (1991).

engaging in an editor's work of combing the writing for oversights, I find it unlikely (a possibility) that the visual surveillance revealed that [Luthy] stopped at any location before he arrived at the location where the cocaine sale occurred."

See *Commonwealth* v. *Donahue*, 430 Mass. 710, 712 (2000); *Commonwealth* v. *Harmon*, 63 Mass. App. Ct. 456, 461 (2005). See also *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. 210, 213 (2005) ("The fact that police never observed short-term visitors or other evidence of drug transactions at the defendant's residence . . . is not fatal to probable cause, because the defendant's usual method of operation was to deliver drugs away from his apartment"). In reviewing the affidavit, we are mindful that it "should be read as a whole, not parsed, severed, and subjected to hypercritical analysis." *Commonwealth* v. *O'Day*, 440 Mass. at 301, quoting from *Commonwealth* v. *Blake*, 413 Mass. 823, 827 (1992).

A magistrate may draw " 'normal inferences as to where a criminal would be likely to hide' the drugs he sells." *Commonwealth* v. *O'Day*, *supra* at 302, quoting from *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 484 U.S. 860 (1983). "An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' " *Commonwealth* v. *Gilbert*, 423 Mass. 863, 868 (1996), quoting from *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). See Smith, Criminal Practice & Procedure § 179 (2d ed. 1983 & Supp. 2006).

Here, the magistrate could reasonably infer the type of crime involved, as the statements by Milkman, confirmed by the two controlled buys,[8] indicated that Luthy was distributing cocaine through a drug delivery service. See *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. at 59-60 (finding significance in the pattern of the drug delivery service). Furthermore, on the basis of Milkman's statements, buttressed by the two controlled buys, the magistrate could infer that Luthy had access to large quantities of cocaine. The magistrate could also have inferred from Milkman's statements, as confirmed by the reliability of his other statements, that Luthy was distributing cocaine to others on a "steady basis." In addition, the surveillance revealed that the black GMC Envoy, used in both controlled buy transactions,

---

[8]The defendants do not challenge the basis of Milkman's knowledge or his reliability. *Commonwealth* v. *O'Day*, 440 Mass. at 301. Moreover, as Milkman's information was confirmed by the first and second controlled buys, any defect, if any existed, was cured. *Commonwealth* v. *Blake*, 413 Mass. 823, 828 (1992).

was parked at the 909 Pike Avenue residence prior to, and immediately following, the second buy. It was a reasonable inference that the drugs were stored someplace other than the automobile, particularly given that Luthy was engaged in a drug distribution business, and the quantity of the drugs involved. See *Commonwealth* v. *O'Day,* 440 Mass. at 303 ("unlikely that the defendant would keep so large a supply of drugs in the truck while at home"); *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. at 213. Moreover, it was reasonable for the magistrate to conclude that 909 Pike Avenue held concealed narcotics. Here, because visual surveillance revealed that Luthy departed his residence at 909 Pike Avenue after his cellular telephone conversation with Milkman coordinating the second buy, the magistrate could have inferred that Luthy had, on at least one occasion, conducted business relating to the drug delivery service and the distribution of illegal drugs from this address. Compare *Commonwealth* v. *Stegemann,* 68 Mass. App. Ct. 292, 302 (2007) (affiant alleged that defendant stopped at his residence only after making sale). Further, the magistrate could have inferred that although the police did not observe Luthy blatantly carrying cocaine from his residence to his vehicle, because drugs are easily secreted inside clothing (here clothing presumably appropriate for June weather), he likely transported them from his residence to his vehicle (and then to the second controlled buy), see *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. at 213. The magistrate could also have inferred that Luthy had records relating to the drug delivery business at the residence. After all, that is where Luthy got the cellular telephone call that set the events of the second controlled buy into motion.

These inferences were reinforced by evidence indicating that after Luthy left his residence, he entered his vehicle, drove away, and soon thereafter arrived at the location appointed for the second controlled buy. Although there may have been some ambiguity in the affidavit as to whether Luthy drove directly from his residence to the buy location, it was reasonable for the magistrate to infer that Luthy likely took drugs from a cache stored in his residence and then proceeded directly to his destination. "We give considerable deference to the magistrate's determination, . . . and even 'the resolution of doubtful or

marginal cases . . . should be largely determined by the prefer-
ence to be accorded to warrants.' " *Commonwealth* v. *Harmon,*
63 Mass. App. Ct. at 460 (citations omitted). Moreover, that
Luthy was kept under surveillance during this trip allowed the
magistrate to infer that it was less likely that Luthy stopped at a
separate location.

Similarly, it was reasonable for the magistrate to infer that
Luthy, who remained under surveillance following the transaction
until he returned to his house, likely brought the fruits of his
transaction into the house. As the search warrant sought monies
in addition to drugs, this evidence provided an additional link
between the criminal activity, the defendant, and the residence.[9]

In arguing that the affidavit was deficient, the defendants rely
heavily on *Commonwealth* v. *Smith,* 57 Mass. App. Ct. 907
(2003), also cited by the judge in his memorandum of decision
on the motions to suppress. The defendants contend that the
*Smith* case stands for the proposition that a sufficient nexus
between criminal activity and a residence could not be
established when there was only one observed transaction. See
*id.* at 908. Consequently, the defendants argue, the fact that in
this case there was only one transaction where the police
observed Luthy leave his house and drive to the meeting with
Milkman makes the affidavit fatally defective. This is a misread-
ing of the *Smith* case. As we subsequently observed, "[a]lthough
the fact that an individual on one occasion drives directly from
his residence to a drug transaction does not, by itself, establish
probable cause to search his residence, see *Commonwealth* v.
*Smith,* 57 Mass. App. Ct. 907, 908 (2003), it may, with ad-
ditional evidence . . . link a defendant's drug-selling activity to
his residence." *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. at
213. In any event, we also note that the *Smith* case was decided

[9]Although not determinative of the existence of the nexus, additional
evidence set forth in the affidavit provided a contextual underpinning favoring
probable cause. As noted, this included evidence that the Attleboro police
department was investigating prior reports of narcotics sales by Luthy, and an
assertion by Detective Cook that Luthy had previously been arrested for
distribution of unlawful drugs. Each of these facts adds further credence to the
inferences that could have been drawn by the magistrate. Contrast *Com-
monwealth* v. *Stegemann,* 68 Mass. App. Ct. at 301 (no probable cause because
court determined that only rational inference supported by affidavit was that
defendant stored drugs at places other than his residence).

prior to the Supreme Judicial Court's decision in *Commonwealth v. O'Day*, 440 Mass. at 304, where the *Smith* case was not given the broad application urged by the defendants here, but cited for the limited proposition that probable cause was lacking because the affidavit provided only "police observations of defendant driving one day from home to drug sale and, on another occasion, to home after drug sale *without more*" (emphasis added). In the *Smith* case, there was no statement regarding the defendant's pattern of operation. Here, Luthy was known to be a convicted drug dealer and his usual method of operation was that, after calls were placed to him ordering drugs, he would deliver the drugs away from his residence. The controlled buys observed by the officers in this case confirmed that method of operation. See *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. at 213 (discussing method of operation); *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. at 60-61 (distinguishing *Commonwealth* v. *Smith, supra*).

While the affidavit here was not a model of craftsmanship, in the final analysis, we conclude that it sufficed to establish a nexus between the criminal activity and the residence to be searched.[10]

> *Order allowing defendants' motions to suppress evidence reversed.*

---

[10]For examples of affidavits with greater specificity and detail, see *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. at 211-212 (informant stated that defendant stored cocaine in residence; month-long independent police surveillance in addition to two controlled buys; unambiguous statement that defendant drove directly from residence to controlled buys); *Commonwealth* v. *Eller*, 66 Mass. App. Ct. at 570 (noting defendant's decade-long use of prior residence as base for drug distribution); *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. at 58-59 (evidence that defendant drove directly from residence to controlled buys).

No doubt search warrant affidavits are often drafted in a hurly burly world without benefit of legal counsel. Ideally, affidavit drafts would have prosecutorial input or at least be reviewed by prosecutors, who will be called upon ultimately to defend challenges to those affidavits, and thus should be poised to anticipate the kinds of legal issues, often avoidable, that might arise.