## COMMONWEALTH vs. JOSE R. COLON.

No. 10-P-1035.

Plymouth. February 7, 2011. - August 22, 2011.

Present: CYPHER, SIKORA, & HANLON, JJ.

*Controlled Substances. Constitutional Law,* Search and seizure. *Probable Cause. Search and Seizure,* Probable cause, Warrant, Affidavit. *Practice, Criminal,* Motion to suppress, Interlocutory appeal.

A Superior Court judge erred in granting the criminal defendant's pretrial motion to suppress evidence obtained by police via a warrant to search the defendant's residence, where the accompanying affidavit provided a sufficient nexus to establish probable cause to believe that cocaine would likely be found in there, in that, based on information obtained from confidential informants and controlled purchases that established that the defendant, in cooperation with a third party, operated a cocaine delivery enterprise from the defendant's residence, and from the method of operation of delivering drugs away from his residence, it was reasonable to infer for purposes of probable cause that the defendant probably kept at the residence not only the drugs he sold, but also cash proceeds and records of drug sales [166-169]; further, the information on which the warrant was based was not stale [170].

INDICTMENTS found and returned in the Superior Court Department on July 30, 2001.

A pretrial motion to suppress evidence was heard by *Suzanne V. DelVecchio,* J., and a motion for reconsideration was heard by *Paul E. Troy,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Robert J. Cordy,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

*Jason Benzaken* for the defendant.

CYPHER, J. The Commonwealth asks in this interlocutory

appeal that we reverse the allowance of the defendant's motion to suppress, urging that there was probable cause to search the defendant's residence as the operating center of his cocaine distribution business. We agree that the affidavit in support of the search warrant provided a sufficient nexus to establish probable cause that cocaine would likely be found in the defendant's residence.

1. *Background.* The defendant, Jose R. Colon, was indicted in 2001 for trafficking in 200 grams or more of cocaine and for two firearm violations, all as a habitual criminal. After the denial of a motion to suppress, trial was scheduled for November 21, 2006, but the defendant defaulted. After removal of the default and the denial of a motion to reconsider the denial of his motion to suppress, the defendant's application for interlocutory appeal was denied in the Supreme Judicial Court on May 7, 2008. A new motion to suppress was denied on November 18, 2008. The defendant filed a motion to reconsider that denial, and a Superior Court judge on August 28, 2009, ordered the suppression of physical evidence seized and statements the defendant made to the police upon execution of the search warrant at his residence. Soon after, the Commonwealth's petition for interlocutory appeal was allowed in the Supreme Judicial Court.

2. *Facts.* We summarize the most significant facts from within the four corners of the twenty-two page affidavit in support of the warrant, prepared on May 25, 2001, by State police Trooper Dean LeVangie (affiant), an experienced narcotics investigator.

State police were informed in early 2001 by two confidential informants (CI1 and CI2) that they had purchased cocaine in Brockton from a Hispanic man named "Mickey," ordering by cellular telephone numerous times in the previous few months. CI1 told police in February, 2001, that CI1 usually purchased cocaine from Mickey, who drove a black Cadillac vehicle with a tan roof, but that if he was not available, Mickey would send another Hispanic male who drove a small green car. Mickey provided CI1 with a telephone number to call to arrange for a sale, which would be conducted at a location designated by Mickey. CI1 was directed to the area of 20 Brook Street for these purchases. CI1 told police that the two men deal in larger

quantities with a minimum of an "8-ball" (approximately three and one-half grams).

The trooper observed a white Cadillac vehicle parked at 20 Brook Street on February 27, 2001, and determined that it was registered to a Carmen Santiago (Carmen) at the same address. Utility company records indicated that the first-floor apartment at that address was listed to Miguel Santiago, and further investigation revealed that a second, older man, also named Miguel Santiago, lived there and was identified as Mickey from a photograph shown to CI1. Mickey's wife, Carmen, also lived there.[1]

A controlled "buy" was arranged with CI1 on February 28, 2001. CI1 called the cellular telephone number that Mickey had given to CI1 and placed an order. After about forty-five minutes, police observed the location to which CI1 had been directed, and saw a Hispanic male drive up in a green Mazda automobile. After an exchange of money for a substance,[2] the police observed the green Mazda go to 88 South Leyden Street (hereafter the target location). The driver parked in the side driveway at the rear of the house, where he left the car and walked toward the rear of the house. Later, CI1 identified this man from a photograph as the defendant.[3] Police determined through the Registry of Motor Vehicles that the green Mazda was registered to the defendant at 88 South Leyden Street. The United States Postal Service confirmed that a person with the defendant's name received mail at the first-floor apartment at that address, although utility records were in the name of the owner of the building.[4]

---

[1]Mickey, the elder Miguel Santiago, had a lengthy criminal record and was known to have been released from prison about one year before, after completing a fifteen-year sentence imposed in 1992 for trafficking in cocaine. Mickey was known to have used various telephones and apartments to avoid detection, and used a stash apartment separate from his home. He limited his business transactions to large quantities of cocaine, not less than two 8-balls for $300.

[2]CI1 was searched prior to the exchange and found not to possess either money or controlled substances. The substance purchased, which was in a plastic bag, was field tested and the test indicated that it was cocaine.

[3]The defendant had a criminal record dating back to 1975, although not for drug offenses, and had been sentenced to eighteen to twenty years in prison in 1986 on a manslaughter conviction.

[4]On March 1, 2001, while driving the green Mazda, the defendant was stopped by another State trooper and was identified as Jose Colon of 88 South

A second controlled buy from the defendant was arranged with CI1 on March 19, 2001. After CI1 placed a telephone order, a police surveillance unit at 88 South Leyden Street was alerted, and the defendant was observed leaving through the rear door of the house, entering the green Mazda, and driving directly to the prearranged location. After an exchange the defendant returned to 88 South Leyden Street a "short time later." CI1 had obtained a plastic bag of a white powdered substance, which a field test indicated was cocaine.[5]

CI2 made a controlled buy from Mickey on May 21, 2001, calling the same telephone number as used by CI1. CI2 arranged to purchase an 8-ball. Police established the same surveillance procedure.[6] At the target location they observed both a white Cadillac[7] and the green Mazda parked in the driveway. Mickey left in the white Cadillac and drove to the prearranged location to meet CI2. After the transaction, Mickey drove away, made a stop at a business, and returned directly to the target location. CI2 gave police a plastic bag of suspected cocaine, which CI2 had purchased from Mickey. Field testing indicated that it was cocaine. Later CI2 positively identified Mickey, from photographs obtained from the Registry of Motor Vehicles, as the elder Miguel Santiago, and also identified the defendant as the Hispanic man in a green car who sometimes made cocaine deliveries instead of Mickey.

Based on the drug transactions described in the affidavit, Trooper LeVangie opined that the defendant and Mickey operated a cocaine delivery service and that there was probable cause to believe that cocaine may be found in their possession at the target location. He requested a search warrant covering the first floor of the target location, the first floor of 20 Brook

Leyden Street; he said he was going to see his friend Miguel Santiago, behind George's Cafe (the affiant stated that "Santiago's address of 20 Brook Street is in fact located behind 'George's Cafe' ").

[5]CI1 had been searched prior to the cocaine transaction. See note 2, *supra.*

[6]CI2 was searched prior to the cocaine transaction. See note 2, *supra.*

[7]Mickey originally was identified by CI1 as driving a black Cadillac with a tan roof. On March 11, 2001, both a brown Cadillac with a tan roof and a white Cadillac were parked in the driveway of 88 South Leyden Street. The brown and tan Cadillac was backed into the driveway and had no license plate. The affiant opined that the white Cadillac, registered to Mickey's wife Carmen at 20 Brook Street, is Mickey's new vehicle.

Street, the green Mazda, and the white Cadillac. Specifically, the warrant sought controlled substances; materials, products, and equipment used in manufacturing or distributing any controlled substances; records, computers, and electronic devices capable of storing information; and monies used in manufacturing, delivery, and distribution of controlled substances. A conforming search warrant was issued and executed on May 25, 2001. The search at the target location resulted in the seizure of items including cocaine, nearly $12,000 in cash, an electronic scale, and a firearm. The judge's order suppressed these items and statements the defendant made to the police while being detained during execution of the warrant at his residence.

3. *Discussion.* The defendant argues that police observations of the controlled buys did not constitute sufficient probable cause to support a search of his residence. He asserts that because neither confidential informant[8] provided any information about his residence, and because he was a secondary figure in the observed events, there was no reason to believe controlled substances would be found there.[9] He also asserts that because there were no observations of him after March 19, 2001, the search warrant issued on May 25, 2001, was based on stale information.

a. *Probable cause and nexus.* We examine the affidavit submitted by Trooper LeVangie in accordance with familiar principles, reading it in a commonsense fashion to determine whether a magistrate could conclude that the items identified in the application for a search warrant probably would be found in the place to be searched. *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). See generally Smith, Criminal Practice & Procedure § 4.43 (3d ed. 2007 & Supp. 2010).

---

[8]CI1 previously provided reliable and correct information that led to the seizure of cocaine in two different investigations about one year before the present case. CI2 had no previous track record. The defendant does not challenge the basis of knowledge or reliability of the confidential informants. To the extent that any defects in their basis of knowledge or reliability existed, they were cured by police corroboration. See *Commonwealth* v. *O'Day*, 440 Mass. 296, 301 (2003); *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 106 n.8 (2007).

[9]In this appeal, the defendant does not argue that the evidence seized from 20 Brook Street should have been suppressed.

Investigating the information given by CI1 and CI2, police established through three controlled buys that the defendant, in cooperation with Mickey, operated a cocaine delivery enterprise from the defendant's residence at 88 South Leyden Street in Brockton (the target location), responding to telephone orders by delivering cocaine in personal automobiles to the caller at a neutral location chosen by the defendant or Mickey.[10] In each of the three controlled buys, cellular telephone calls were placed to a number previously given to the informants by Mickey.[11] Two buys involved CI1 and the defendant. A third involved CI2 and Mickey.

"The central inquiry is whether the affidavit accompanying the search warrant sets forth probable cause to believe that the drugs or related evidence from the drug delivery service are likely to be found at the defendant['s] residence." *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 105 (2007). "When that location is a residence, there must be specific information in the affidavit, and reasonable inferences a magistrate may draw, to provide 'a sufficient nexus between the defendant's drug-selling activity and his residence to establish probable cause to search the residence.'" *Commonwealth* v. *Pina*, 453 Mass. 438, 440-441 (2009), quoting from *Commonwealth* v. *O'Day*, 440 Mass. 296, 304 (2003). See *Commonwealth* v. *Eller*, 66 Mass. App. Ct. 564, 565 (2006).

Here, as observed by police surveillance teams, the target location was the point of departure for two of the controlled buys, and the point of return for three buys. In each instance a car left the target location and proceeded directly to the point of delivery. It is therefore a reasonable inference that the cocaine delivered either was in the car or was brought with the deliverer when he left the house to make the delivery. There were no direct observations that the defendant (or Mickey) left from or

---

[10]This type of delivery system has been described in many of our cases. See, e.g., *Commonwealth* v. *Pina*, 453 Mass. 438, 440 (2009); *Commonwealth* v. *Rodriguez*, 75 Mass. App. Ct. 290, 292-294 (2009).

[11]The number given to the confidential informants was for a cellular telephone registered to a Mario E. Alamo in Fall River. Police were unable to match the Social Security or Registry of Motor Vehicles information they were given with that name. The affiant believed it was a fictitious name used either by Mickey or the defendant.

returned to the first floor of the target location, because he parked at the rear of the building and the rear door generally could not be viewed. However, the defendant had been seen entering and exiting the rear door several times. These facts reasonably indicate that the defendant's residence, on the first floor, was the base of his operations and would contain evidence of those operations, including, but not limited to, the cocaine.[12]

"The fact that police never observed short-term visitors or other evidence of drug transactions at the defendant's residence . . . is not fatal to probable cause, because the defendant's usual method of operation was to deliver drugs away from his apartment. . . . [P]olice surveillance of the defendant's movements[] sufficiently confirm[ed] that his apartment was the base for his operations . . . ." *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. 210, 213-214 (2005). From the method of operation of delivering drugs away from his apartment, "it was reasonable to infer for purposes of probable cause that [the defendant] probably kept the drugs he sold in his apartment." *Commonwealth* v. *Alcantara*, 53 Mass. App. Ct. 591, 594 (2002). The routine of leaving from and returning to the residence demonstrated a pattern of drug dealing consistent with a cocaine delivery service, and it was reasonable to infer that the delivery service was based out of the residence where the drugs were kept prior to delivery. See *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. 56, 60 (2007), and cases cited. Compare *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. at 106-108 & n.9; *Commonwealth* v. *Rodriguez*, 75 Mass. App. Ct. 290, 298-299 (2009); *Commonwealth* v. *Young*, 77 Mass. App. Ct. 381, 388 (2010).[13]

---

[12]Police also observed several instances of the green Mazda or Cadillac leaving the target location and meeting an individual for a short time, circumstances consistent with street-level drug transactions. These instances included the defendant driving the green Mazda on March 1, March 11, and April 23, 2001.

[13]The defendant argues that the affidavit failed to establish probable cause that cocaine would be found at his residence, claiming that the motion judge properly followed the decision in *Commonwealth* v. *Pina*, 453 Mass. 438 (2009). In that case, the court concluded that the observation of the defendant drug seller leaving his apartment on a single occasion to go directly to the site of a controlled purchase, without any other "particularized information based on police surveillance or otherwise," did not permit a "reasonable inference that the defendant likely kept a supply of drugs in his apartment." *Id.* at 442.

In applying *Pina*, the motion judge here stated that neither the police nor

"Among the infinite variety of additional facts human behavior can provide (together with the reasonable inferences to be drawn from them) to establish probable cause to search a residence, one cannot exclude a drug dealer's pattern of leaving and returning to his residence for each drug sale. A pattern of repeated activity giving rise to a reasonable inference that a dealer's residence is being used as the base for his drug operation provides sufficient nexus to search the residence." *Commonwealth* v. *Escalera*, 79 Mass. App. Ct. 262, 266, further appellate review granted, 460 Mass. 1101 (2011).

It also is a reasonable inference that the cash proceeds and records of drug sales would be kept at the residence. "Drug dealers do not provide receipts for product purchases; nor are informants privy to the private business records of any money generating drug enterprise. What records are kept, and surely they are, given the nature of the business, are typically beyond the reach of police surveillance." *Commonwealth* v. *Santiago*, 66 Mass. App. Ct. 515, 522 (2006). Once it is established that a defendant is operating a drug business that includes his residence, it is unnecessary to add much more to an affidavit to justify searching for proceeds or records related to that business. *Ibid.* Cf. *Commonwealth* v. *Rodriguez*, 75 Mass. App. Ct. at 300.[14]

---

the informant ever observed the defendant selling drugs from his residence or transporting packages to his car, and concluded that without this direct evidence there was no probable cause to search his residence. However, the *Pina* court noted that generally the "connection between the items to be seized and the place to be searched does not have to be based on direct observation." *Ibid.*

[14]We also note that the affiant here stated that Mickey's prior, similar distribution operation also involved two residential bases of operation, including a "stash" location. Compare *Commonwealth* v. *Turner*, 71 Mass. App. Ct. 665, 668 (2008), where we relied in part on a police officer's more general statement that in his experience "narcotic dealers do not carry large quantities of drugs on their person and keep their drug stash as well as the proceeds from the transactions at their residence." Similarly, a prominent authority observes the role of experience of police in determinations of probable cause to search a residence in circumstances where drug sellers operate to deliver drugs away from their residences:

> "[T]here need not be definite proof that the seller keeps his supply at his residence . . . it will suffice if there are some additional facts . . . such as . . . that the seller or buyer went to his home prior to the sale or after the sale . . . . But in more recent times many courts have been disinclined to require such facts in the particular case to support that

   b. *Staleness.* There is no merit in the defendant's assertion that because there were no observations of him after March 19, 2001, the search warrant issued on May 25, 2001, was based on stale information. In any event, the third controlled buy with Mickey was made on May 21, 2001, and on May 22 and 23, Mickey was observed conducting what police characterized as street-level drug transactions. While facts must be closely related to the time of issuance of a warrant, where the defendant and Mickey were engaged in an ongoing drug distribution business, time is of less significance. See *Commonwealth* v. *Cruz*, 430 Mass. 838, 843 (2000); *Commonwealth* v. *Rice*, 47 Mass. App. Ct. 586, 590 (1999). We conclude that the warrant was timely issued.

   4. *Conclusion.* The affidavit in support of the search warrant application provided probable cause to search the defendant's residence and car for cocaine and other evidence of a cocaine distribution business. The order allowing the defendant's motion to suppress evidence is reversed, and a new order shall enter denying the motion.

*So ordered.*

---

       inference. Rather, it is commonly held that this gap can be filled merely on the basis of the affiant-officer's experience that drug dealers ordinarily keep their supply, records and monetary profits at home." (Footnotes omitted.)

2 LaFave, Search & Seizure § 3.7(d), at 420-422 (4th ed. 2004).