## COMMONWEALTH *vs.* ANTHONY J. MONTEIRO.

No. 10-P-1648.

Plymouth. April 14, 2011. - August 22, 2011.

Present: RAPOZA, C.J., CYPHER, & CARHART, JJ.

*Controlled Substances. Constitutional Law,* Search and seizure. *Probable Cause. Search and Seizure,* Probable cause, Warrant, Affidavit. *Practice, Criminal,* Motion to suppress, Interlocutory appeal.

INDICTMENTS found and returned in the Superior Court Department on November 2, 2009.

A pretrial motion to suppress evidence was heard by *Carol S. Ball,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Judith A. Cowin,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

*Katherine Essington* for the defendant.

CYPHER, J. In this interlocutory appeal by the Commonwealth, we must determine whether there was probable cause to search the residence of the defendant, Anthony J. Monteiro, who was

engaged in a drug delivery service.[1] The principal issue is whether the affidavit in support of the search warrant permitted a magistrate to conclude that there was a sufficient nexus between the defendant's drug selling activity and his residence to establish probable cause to search the residence. We conclude that the affidavit did so.

*Facts.* An experienced Brockton narcotics unit police officer, Thomas Keating (affiant), applied for a warrant on April 10, 2009, to search the defendant's single-family home at 46 Vine Street in Brockton and a Chevrolet Tracker utility vehicle. The affiant stated in his supporting affidavit that he had been informed by a confidential informant (CI) that a described male known to him as "Tony" was dealing in "crack" cocaine from 46 Vine Street by responding to orders placed through telephone calls to a number CI had been given, and that Tony delivers the cocaine while driving a black Chevrolet Tracker utility vehicle with a specified Massachusetts registration tag (Chevy Tracker). CI described Tony as a black male, about five feet seven inches tall, with a medium build, wearing glasses. Police subsequently obtained a digital image of the defendant, Anthony Monteiro, from the Registry of Motor Vehicles, and from it CI positively identified the defendant as Tony. Police investigation determined that the defendant, his wife Sheila Gamble, and her son lived at 46 Vine Street; that the telephone number used by CI appeared on electric utility records billed to Sheila Gamble at that address; and that the Chevy Tracker was registered to Sheila Gamble. A criminal history of the defendant indicated that he had been convicted of trafficking in cocaine in 2002.

On March 11, 2009, CI agreed to make a controlled "buy" from Tony. CI first was searched by the affiant and found not to possess any controlled substances. Using the specified telephone number, CI called Tony in the presence of the affiant and made arrangements for a meeting at a location designated by Tony.

---

[1]After Brockton police executed a search warrant for the defendant's residence on April 10, 2009, the defendant was indicted in November, 2009, for trafficking in twenty-eight to 100 grams of cocaine and for a drug violation in a school zone. A Superior Court judge allowed the defendant's motion to suppress on February 1, 2010. The Commonwealth's application for an interlocutory appeal was allowed in the Supreme Judicial Court on March 16, 2010, and the appeal was entered in this court on September 22, 2010.

The affiant and CI went to the designated location while two detectives conducted a surveillance of 46 Vine Street where the Chevy Tracker was observed parked in the driveway. Within five minutes of the telephone call, the detectives observed Tony walk out the front door, enter the Chevy Tracker, and back out of the driveway. They followed it to the designated location. The affiant observed the Chevy Tracker approach and watched CI go to the driver's side window for about forty-five seconds to one minute, then walk away as the vehicle left. The detectives followed the vehicle, saw it enter the driveway at 46 Vine Street, and saw Tony depart the vehicle and enter the front door of the premises. Meanwhile, CI directly approached the affiant, handing him an off-white, hard rock-like substance which he had obtained from Tony in exchange for the sum of money they had agreed on by telephone. The affiant field tested the substance and it tested positively for cocaine, which he turned in as evidence.

A second controlled buy was arranged by CI on March 15, 2009, following similar procedures, except that instead of there being two surveilling detectives, the affiant, after meeting with CI, drove to 46 Vine Street, saw the Chevy Tracker in the driveway, then returned to the designated location where he saw the Chevy Tracker arrive. CI approached the Chevy Tracker and stood at the driver's side window for about one minute. The Chevy Tracker drove away and CI gave the affiant an off-white, hard rock-like substance purchased from Tony. The affiant then drove by 46 Vine Street where he saw the Chevy Tracker parked in the driveway. Field testing again revealed the seized substance to be cocaine.

A third controlled buy was arranged on March 22, 2009, which occurred substantially as in the second buy, with the exception that it was at about five minutes prior to the telephone call placed by CI that the affiant drove by 46 Vine Street and observed the Chevy Tracker in the driveway. After the buy transaction was completed, the affiant drove back to 46 Vine Street where he saw the Chevy Tracker in the driveway about ten minutes after the buy.

A fourth controlled buy was arranged by CI on March 30, 2009. The same procedures as in the first controlled buy were

followed; that is, two detectives saw Tony leave the house, followed the Chevy Tracker to the designated location, then followed it back to 46 Vine Street after the controlled buy and saw Tony enter the house.

A fifth controlled buy was arranged on April 9, 2009. About twenty minutes before CI made the telephone call, the affiant observed the Chevy Tracker in the driveway of 46 Vine Street, and while he was observing CI waiting for the arrival of the Chevy Tracker, a detective went to 46 Vine Street where he did not see the Chevy Tracker. Within five minutes after the buy transaction was completed, the detective saw the Chevy Tracker enter and park in the driveway and the driver, Tony, walk toward the rear of the house where the rear door is located.

The affiant requested the issuance of a warrant authorizing a search of 46 Vine Street and the Chevy Tracker. The warrant authorized a search for, inter alia, controlled substances; materials, equipment, and records used in processing and delivery of controlled substances; and monetary proceeds from the sale of controlled substances. The return of the affiant, who conducted the search, listed as items seized a clear glass jar containing an off-white, hard rock-like substance in water, weighing thirty-four grams, and a magnetic key holder containing ten individual pieces of crack cocaine, weighing five grams. Also seized were $3,372 in currency, plastic baggies with cut corners, a digital scale, and "paperwork."

*Discussion.* The defendant argues that the motion judge did not err by allowing the motion to suppress when he ruled that the police were without probable cause to search the defendant's residence because no nexus was shown between his drug-selling activities and his residence. We examine the affidavit submitted with the application for the search warrant in accordance with well-known and long-established principles to determine whether a magistrate could conclude that the items stated in the application probably would be found in the place to be searched. *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). See generally Smith, Criminal Practice & Procedure § 4.43 (3d ed. 2007 & Supp. 2010).

The informant gave police somewhat limited but very specific information — that a man known to him as "Tony," later

identified as the defendant, was "dealing crack cocaine from 46 Vine Street [in] Brockton," and did so by what the informant described as what is now well-known as a "narcotics delivery service."[2] *Commonwealth* v. *Pina*, 453 Mass. 438, 440 (2009). Acting on this information, police arranged five controlled buys in which CI purchased rock cocaine from the defendant each time. On three of those occasions, surveillance demonstrated that the defendant's Chevy Tracker was parked at his residence both shortly before and shortly after the defendant drove it to the sale location.[3] On two occasions the defendant was observed leaving the house beforehand, driving the Chevy Tracker directly to and from the sale location, and then reentering the house.[4] Such a routine of leaving from and returning to a residence demonstrated a pattern of drug dealing consistent with a drug delivery service, and it was reasonable to infer that the delivery service was based out of the residence. See *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. 56, 60 (2007), and cases cited.

Our inquiry now is "whether the affidavit accompanying the search warrant set[] forth probable cause to believe that the drugs or related evidence from the drug delivery service [were] likely to be found at the defendant['s] residence." *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 105 (2007). "[T]he nexus between the items to be seized and the place to be searched need not be based on direct observation." *Commonwealth* v. *Cinelli*, 389 Mass. at 213. " 'The nexus may be found in "the type of crime, the nature of the . . . items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide" ' the drugs he sells." *Commonwealth* v. *O'Day*, 440 Mass. 296, 302 (2003), quoting from *Commonwealth* v. *Cinelli, supra.*[5] See *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. at 106.

---

[2]While CI had no track record with the police, any defects in CI's knowledge or reliability were cured by police corroboration of the details of the defendant's modus operandi. *Commonwealth* v. *O'Day*, 440 Mass. 296, 301 (2003).

[3]On March 15, March 22, and April 9, 2009. (On the latter occasion, a second detective also saw the defendant return to his residence in the Chevy Tracker five minutes after the buy.)

[4]On March 11 and March 30, 2009.

[5]For a collection of cases on the determination of nexus see Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 8-1, at 8-3 to 8-4 (2009-2010 ed.).

In the closely surveilled drug delivery service in this case, there is no indication that the cocaine sold by the defendant came from sources away from his residence. The defendant's ability to deliver small quantities of rock cocaine quickly so many times on demand suggests that he had a larger source close at hand in his residence which easily could be divided for distribution. Moreover, the defendant likely returned to the house to place the monetary proceeds of the transactions in a safe place. Compare *id.* at 107-108.

From the method of operation of delivering drugs away from his residence, "it was reasonable to infer for purposes of probable cause that [the defendant] probably kept the drugs he sold in his [residence]." *Commonwealth* v. *Alcantara,* 53 Mass. App. Ct. 591, 594 (2002). "The fact that police never observed . . . evidence of drug transactions at the defendant's residence . . . is not fatal to probable cause, because the defendant's usual method of operation was to deliver drugs away from his [residence]." *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. 210, 213 (2005). "A pattern of repeated activity giving rise to a reasonable inference that a dealer's residence is being used as the base for his drug operation provides sufficient nexus to search his residence." *Commonwealth* v. *Escalera,* 79 Mass. App. Ct. 262, 266, further appellate review granted, 460 Mass. 1101 (2011).

"[P]olice surveillance of the defendant's movements[] sufficiently confirm[ed] that his [residence] was the base for his operations." *Commonwealth* v. *Hardy, supra* at 214. "Because of the police observations, this is not a case where 'there was no specific information in the affidavit which tied the defendant's residence to illegal drug transactions, other than that he lived at those premises.' " *Ibid.,* quoting from *Commonwealth* v. *Chongarlides,* 52 Mass. App. Ct. 366, 370 (2001). Where there is a pattern of leaving and returning to a residence directly before and after each drug sale, it is a reasonable inference that the contraband is kept in the residence. *Commonwealth* v. *Colon, ante* 162, 168 (2011).[6]

Finally, a search of the residence for records of the defend-

---

[6]The defendant cites *Commonwealth* v. *Pina,* 453 Mass. 438, 441 (2009) — which relied on *Commonwealth* v. *Smith,* 57 Mass. App. Ct. 907, 908 (2003) —

ant's drug business was justified. "Drug dealers do not provide receipts for product purchases; nor are informants privy to the private business records of any money generating drug enterprise. What records are kept, and surely they are, given the nature of the business, are typically beyond the reach of police surveillance. Once it was established that the defendant was operating a drug business that included [his residence], little, if anything more, needed to be added in the affidavit to justify searching for 'records, ledgers, or proceeds' " (footnote omitted). *Commonwealth v. Santiago,* 66 Mass. App. Ct. 515, 522 (2006).

"We give considerable deference to the magistrate's determination, . . . and even 'the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants.' " *Commonwealth* v. *Harmon,* 63 Mass. App. Ct. 456, 460 (2005), quoting from *Commonwealth* v. *Germain,* 396 Mass. 413, 418 (1985).

We think that the magistrate had a substantial basis for concluding that the items described in the warrant probably were in the place to be searched. See *Commonwealth* v. *Upton,* 394 Mass. 363, 370 (1985); *Commonwealth* v. *Santiago, supra* at 521.[7]

The order allowing the defendant's motion to suppress is reversed. A new order shall enter denying the motion.

*So ordered.*

---

to assert that in this case there was no "particularized information based on police surveillance or otherwise, that would permit a reasonable inference that the defendant likely kept a supply of drugs in his apartment." *Commonwealth* v. *Pina, supra* at 442. We think the *Pina* and *Smith* cases are readily distinguishable because here there were a number of drug deliveries sharing a common itinerary centered on the defendant's residence, which, when added to CI's tip that the defendant's base of operations was his residence, "elevate[d] the information acquired by police observation above the floor required for probable cause." *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. 210, 214 (2005), quoting from *Commonwealth* v. *Saleh,* 396 Mass. 406, 411 (1985).

We note that *Pina* has been distinguished on similar grounds in *Commonwealth* v. *Young,* 77 Mass. App. Ct. 381, 387-388 (2010), and *Smith* has been distinguished in *Commonwealth* v. *Gallagher,* 68 Mass. App. Ct. at 60-61, and *Commonwealth* v. *Luthy,* 69 Mass. App. Ct. at 108-109.

[7]There is no dispute that the warrant was timely issued. It was issued and executed one day after the last controlled buy.